AO 91 (Rev. 11/11)   Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
6/23/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPTUY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
6/23/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ clee _____ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   2:26-mj-03709-DUTY |
| Kenneth Mellor | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ June 2, 2025 _____ in the county of _____ Los Angeles _____ in the
_____ Central _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2251(a),(e) | Sexual Exploitation of a Child for the Purpose of Producing a Sexually Explicit Visual Depiction |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

FBI SA Chelsea Malone
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  June 23, 2026

*Judge's signature*

City and state:  Los Angeles, California

The Honorable Steve Kim, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* Blake Hannah (x0172)

## AFFIDAVIT

I, Chelsea Malone, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of a criminal complaint against and arrest warrant for KENNETH MELLOR ("MELLOR" or "SUBJECT"), for a violation of 18 U.S.C. § 2251(a), (e) (Sexual Exploitation of a Child for the Purpose of Producing a Sexually Explicit Visual Depiction) (the "SUBJECT OFFENSE").

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this manner.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.    INTRODUCTION

3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April 2022. As a Special Agent, I have conducted and participated in many investigations into criminal activity. I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of violations of federal and state law. In my current position, which I have held since being assigned to the Los Angeles Field Office in August 2022, I

investigate the sexual exploitation of children in the Central District of California and associated violations of federal law.

4.   I have received training in the investigation and prosecution of child pornography and child exploitation offenses. Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children. My training and experience has given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

### III.  SUMMARY OF PROBABLE CAUSE

5.   As set forth in greater detail below, throughout 2024 and 2025, MELLOR utilized various social media platforms, online gaming, and text messaging to contact multiple minor females, ranging in ages between nine and 17 years old. MELLOR groomed the minor victims; enticed minor victims to engage in sexual activity, oftentimes on video calls; sent explicit images of himself to minors; and solicited minors to produce Child Sexual Abuse Material ("CSAM"). Moreover, MELLOR utilized the threat of violence towards himself, violence towards the minor victims and their family members, and/or the threat of releasing explicit images to coerce some of the minor victims to continue to send CSAM or engage in sexually exploitative activity. In some cases, minor victims were enticed to engage in sex acts while on video calls, while MELLOR took screenshots.

## IV.   STATEMENT OF PROBABLE CAUSE

6.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.   MELLOR IS REPORTED TO THE FBI FOR SEXTORTION

7.   On or about October 3, 2025, R.L., a then 19-year-old male, contacted the FBI to report that one of his friend's, MINOR VICTIM 1 ("MV1") was the victim of sextortion by MELLOR. R.L. also reported that he was aware of other victims, one later identified as MINOR VICTIM 2 ("MV2"). I interviewed R.L. and learned that R.L. was friends with the then 15-year-old girl, MV1. MV1 told R.L. that she had sent explicit photos of herself to MELLOR. At some point MELLOR threatened to release the photos of MV1. R.L. also stated that MELLOR told him that MELLOR had a 12-year-old girlfriend, MV2.

8.   On or about October 6, 2025, I was contacted by MV2 and conducted a minimal facts interview of the minor. MV2 confirmed that she was 13 years old, sent CSAM to MELLOR, and that MELLOR had sent the CSAM images of MV2 to another person. The same day, I spoke with MV2's mother, S.G., who informed me that MELLOR had sent her CSAM of MV2.  MELLOR was aware of MV2's age because S.G. had told MELLOR and sent him photos of MV2's birth certificate. I later confirmed this information while reviewing MELLOR's cellphone seizure pursuant to a search warrant. I reviewed messages between MELLOR and S.G. and observed that on or about January 11, 2025, S.G. sent MELLOR a

3

copy of MV1's vaccination records, which included her date of birth and home address.

9. On or about October 10, 2025, S.G. provided FBI personnel with her cellphone and consent to search her iCloud account. On October 14, 2025, I accessed S.G.'s iCloud account and observed five CSAM images believed to be of MV2 sent from MELLOR to S.G.[1] MELLOR sent the CSAM to S.G. and told her that they were of her daughter.

B. FEDERAL SEARCH WARRANTS EXECUTED AT MELLOR'S RESIDENCE

10. On October 16, 2025, the Honorable Jacqueline Chooljian, United States Magistrate Judge for the Central District of California, issued warrants to search MELLOR'S person[2] and premises[3] for violations of 18 § U.S.C. 2252A(a)(2)(Receipt and Distribution of Child Pornography) and 18 § U.S.C. 2252A(a)(5)(B) (Access With Intent to View and/or Possession of Child Pornography). Those warrants are attached as **Exhibit 1** and **Exhibit 2**.

11. On November 14, 2025, the Honorable Charles Eick, United States Magistrate Judge for the Central District of California, issued a warrant[4] to search digital devices seized pursuant to the search warrants in **Exhibits 1** and **2**. This

---

[1] Three of the CSAM images were identified as being of MV2 based on her Child Adolescent Forensic Interview ("CAFI") that occurred later in the investigation. MV2 identified one of the images as being of a different minor who was a friend of MV2's.

[2] Case number 2:25-MJ-06437

[3] Case number 2:25-MJ-06434

[4] Case number 2:25-MJ-07128

4

warrant, which is attached as **Exhibit 3**, contained additional subject offenses: 18 U.S.C. § 2251 (Production and/or Attempted Production of Child Pornography), and 18 U.S.C. § 2422(b) (Enticement or Attempted Enticement of a Minor to Engage in Criminal Sexual Activity).  **Exhibits 1, 2** and **3** are incorporated herein by reference.

> C.    MELLOR ADMITTED TO PRODUCING AND DISTRIBUTING CSAM OF MV2

12.  As previously described, prior to executing the search warrant at MELLOR's residence, S.G. provided me with various messages that MELLOR sent to S.G.  During the review, I observed that MELLOR had sent several CSAM images of MV2 to S.G.  One of the images, sent on or about August 17, 2025, approximately seven months after S.G. sent MELLOR documentation of MV2's date of birth, depicted what appeared to be a screenshot of a video call in which MV2 was displaying her vagina, and in the top right of the screen, where the other user's video was visible, a penis was observed.

13.  MELLOR was advised of his rights pursuant to Miranda, waived his rights, and agreed to be interviewed during the search warrant execution.  Agents asked him about the CSAM images sent to S.G.  MELLOR confirmed that he had sent CSAM images of MV2 to her mother. MELLOR also stated that he was told MV2 was multiple different ages between 13-16, but did confirm that S.G. sent him a copy of MV1's birth certificate and that he learned MV2 was 12 from S.G. Moreover, MELLOR confirmed that he captured the previously described screenshot of the video call

in which MV2 displays her vagina.  MELLOR also confirmed that the penis was his, and that the female was MV2.  MELLOR stated that he and MV2 would get on video calls and "show" each other their genitalia.  MELLOR denied taking the screenshots for sexual purposes but indicated he did it to show S.G. what her daughter was doing.

D.    MULTIPLE MINOR VICTIMS WERE IDENTIFIED FROM MELLOR'S DIGITAL DEVICES

14.  On March 13, 2026, I completed a review of MELLOR's cellphone, which was seized pursuant to search warrant case number 2:25-MJ-06434. On March 19, 2026, I completed a review of MELLOR's computer, which was also seized pursuant to the search warrant in case number 2:25-mj-06434. During this time, I observed numerous suspected CSAM files and messages indicating the production and/or attempted production of CSAM. I observed approximately 19 minor victims and began working to identify the minors based on their usernames, telephone numbers, and other provided identifiers, as described in greater detail below. Approximately eight of those minor victims have been identified and interviewed via CAFI.  Approximately three minor victims have been identified by family members, but have not been interviewed via CAFI. The remaining victims have not yet been identified. As described in greater detail below, an additional minor victim was also identified after a third party contacted the FBI to report her interactions with MELLOR, and she was subsequently interviewed via CAFI; however, the victimization took place after MELLOR's digital devices were seized in the

search warrant so I have not yet been able to determine if MELLOR's digital devices contain CSAM files and messages indicating the production and/or attempted production of CSAM as it relates to this victim.

    E.   <u>MINOR VICTIM 1 ("MV1")</u>

15. On or about January 30, 2026, MV1 was interviewed via CAFI. MV1 is currently a 15-year-old female residing in Pennsylvania. MV1 would have been 14 years old during her interaction with MELLOR. From my review of MELLOR's cellphone and computer, as well as MV1's statements during her CAFI, I am aware that MELLOR and MV1 communicated via Tiktok, then Discord, and then Tiktok again after they ended their relationship. I did not observe messages between MELLOR and MV1 from when they first started communications on Tiktok on MELLOR's cellphone; however, MV1 indicated during her CAFI that it was approximately three months prior to when she ceased communications in August 2025, indicating the conversations started in approximately May 2025. During the CAFI, MV1 also stated that MELLOR asked her age initially on Tiktok and she told him that she was 15. MELLOR told MV1 that he was 15 and both spoke about going to school and what grade MV1 was in. Based on my review of MELLOR's Discord account, I observed messages between MV1 and MELLOR starting on approximately June 3, 2025. Based on this information, MELLOR would have been aware of MV1's age in approximately May 2025, prior to speaking to MV1 on Discord on or about June 3, 2025.

16. On or about October 17, 2025, MELLOR was advised of his rights pursuant to Miranda, waived his rights, and agreed to

7

be interviewed during the search warrant execution. During the interview, MELLOR stated that he believed MV1 was either 16 or 17 years old, but at some point MV1's mother told MELLOR that she was actually 15. MELLOR claimed that MV1's parents knew about their relationship and offered to fly MELLOR to Pennsylvania, where MV1 and her family resided. MELLOR stated that MV1's mother knew MELLOR's age and didn't mind it. MELLOR confirmed that MV1 sent photos of her genitalia to him. MELLOR also stated that they would show each other their genitals on video call, but that he didn't masturbate on video call. MELLOR also stated that he kept the CSAM of MV1 until approximately March 2025 and then deleted the photos. MELLOR also stated that if MV1 was 16, and her family approved, he would date her again.

17. During her CAFI, MV1 provided the following information:

a. MELLOR and MV1 met on Tiktok. MELLOR received messages from MELLOR on Tiktok. The conversation transitioned to Discord and Snapchat. MELLOR kept messaging MV1, asking her if she would date him. MV1 and MELLOR then started dating. MV1 was added to a group on Discord, which included other users that MELLOR stated were his friends. MV1 was then added to another group on Discord with other females who had purportedly dated MELLOR. The other girls told MV1 that MELLOR said sexual things to them. MV1 told MELLOR that she wanted to break up, to which MELLOR responded that he was going to kill himself and that it would be her fault. On one occasion, when MV1 tried to break up

8

with MELLOR, he sent her a photo of his arm cut up. MV1 was scared by MELLOR's self-harm, so she stayed with him.

b.    MV1 kept getting messages from other girls telling her that MELLOR wasn't the age he told her. MELLOR told MV1 that he would have to go to school, but he would be on Roblox or other applications during school time, so MV1 started to believe he was lying about his age. MELLOR told MV1 that he was 15 or 16 at the time but later told her another age. MELLOR kept telling MV1 different ages. At some point, MELLOR told MV1 that he was 18, to which MV1 responded that she was a minor and quit speaking to him. Approximately one week later, they continued speaking and MELLOR told MV1 that he was actually 19. MV1's age came up multiple times during the course of their interactions. In approximately August 2025, MV1 blocked MELLOR and ceased contact with him.

c.    When MV1 and MELLOR first started dating, he wasn't mean. As time progressed, MELLOR started to get mean, would yell at her, and call her names. MELLOR would get angry, threaten to harm himself, and blame MV1. MELLOR told MV1 that she didn't deserve to walk this Earth.

d.    MELLOR sent MV1 photos of his face and his genitalia. MELLOR told MV1 that if she didn't send CSAM in return, he would harm himself. MELLOR wanted photos of her breasts and vagina. Anytime MV1 stated she didn't want to send the pictures, MELLOR threatened to kill himself. MV1 didn't want MELLOR to hurt himself, so MV1 sent the images. MELLOR would send photos of his genitalia and then ask MV1 to send pictures

9

in return, which MV1 knew to mean he wanted pictures of her genitals. In some messages, MELLOR would tell MV1 directly what areas of her body that he wanted to see, for example, he would tell her he wanted to see her breasts or genitals. The pictures or videos were sent on Discord and Snapchat. MELLOR asked MV1 to touch her vagina and send videos of her doing so.

e. MELLOR liked to engage in sleep calls in which MV1 would have to keep the video call on all night. MV1 would mute the video call. MV1 would wake up in the morning and sometimes MELLOR would turn his camera and start masturbating. While MELLOR was masturbating, MV1 would put her camera down. MELLOR also asked MV1 to masturbate on the video call. MV1 did not want to masturbate on video call, which led MELLOR to again threaten suicide. MV1 gave in to MELLOR's threats and would touch herself on the video calls with him. As far as MV1 knows, MELLOR did not take screenshots of the sexual video calls.

f. MV1 positively identified a photo of MELLOR, provided his social media account usernames, and provided that he lived in Palmdale, California.

18. While reviewing MELLOR's cellphone and computer, I observed numerous messages between MELLOR and MV1. A significant portion of the messages were sexual in nature. For example, on or about June 15, 2025, MELLOR message MV1 via Tiktok "Someone gave me A hard one". Later in the conversation, MELLOR stated "I was Watching your pus pics". On or about August 4, 2025, MELLOR messaged MV1 via Tiktok "If I Wanted be Friends I wouldn't Have ur pussy still", "Or your V pic", "If I Wanted be Your friend",

10

"I would have all those pics still", "Wouldn't", and "But I do".
Additionally, a suspected CSAM image was identified. The image
appeared to be a screenshot of a video call between MELLOR and a
female. The female was seen inserting an object into her vagina.
The username of the female was similar to the username that MV1
utilized.[5] Additionally, I observed a screenshot from a Discord
conversation between MELLOR and MV1, in which MELLOR was asking
MV1 to get on a call. Prior to that, MELLOR was threatening MV1
with multiple messages including "I have your address Dumb
fuck", and "Ill see you in couple months".

19.   On April 15, 2026, MV1 was again interviewed via CAFI
and asked about the two detailed images. MV1 provided the
following information:

a.   In reference to the image with messages such as
"I have your address Dumb fuck", and "Ill see you in couple
months", MV1 recalled that the Discord screenshot was from an
argument between herself and MELLOR. MELLOR knew that MV1 lived
in Pennsylvania, but she did not provide her exact address to
him.

b.   MELLOR had sent MV1 images in which MELLOR harmed
himself. MELLOR would threaten to hurt himself if MV1 refused to
do what he asked, to include sending him CSAM. MELLOR had seen
MV1 nude on video calls previously and MELLOR would instruct MV1
on what to do and where to touch herself.

---

[5] As described in greater detail below, the image was later
identified by MV1 during an interview as being of another
suspected minor victim who utilized a name similar to MV1 and
pretended to be her online.

11

c.   MV1 was shown an image of a screenshot of a video call in which a female could be seen inserting a hairbrush into her vagina, as described in greater detail above. The username in the CSAM screenshot was similar to MV1's, but it was not hers. Another female created an account with a username similar to MV1's and pretended to be her; however, it was not MV1.[6]

20.  On November 26, 2025, the Honorable Alicia G. Rosenberg, United States Magistrate Judge for the Central District of California, authorized a search warrant for MELLOR's Discord account, username DVORAPS69, for violations of 18 § U.S.C. 2251 (a),(e)(Production or Attempted Production of Child Pornography), 18 § U.S.C. 2252A(a)(2)(Receipt and Distribution of Child Pornography) and 18 § U.S.C. 2252A(a)(5)(B) (Access with Intent to View and/or Possession of Child Pornography).[7] The warrant is attached as **Exhibit 4.**

21.  Due to technical issues, FBI Computer Analysis and Response Team members were unable to process some of the responsive files from Discord until approximately April 2026. On June 9, 2026, I reviewed some of the Discord messages between MELLOR and MV1, obtained from the aforementioned search warrant, and observed the following:

a.   MELLOR repeatedly threatened to kill himself in messages to MV1. On or about June 4, 2025, MELLOR messaged MV1

---

[6] At the time of this affidavit, the other female has not been identified, therefore it is unknown whether or not she is a minor.

[7] Case number 2:25-MJ-07413

12

that he drank bleach because she was leaving him. He told her that he felt dizzy, his heart was burning, and that he was going to die. He messaged her repeatedly, without a response from MV1, things such as "no More fighting please", "You killing me", "she wouldn't like that", "Aka you", "No other grims", "Girls", "im shy noz", "You have me Hard", "maybe it's the bleach", and "But it Burns too". MELLOR sent MV1 several similar messages in addition to "Listen say it now i promise too not fight and Let you destroy my insides daddy", "Please mommy", "Send me some Vids", "I love you", "Wash my cock With your mouth", "Bby", "Hurry Up With that Shower daddys cock needs you", and "man am i Gonna pound that pussy".

        b.    On or about June 19, 2025, MELLOR and MV1 engaged in the following conversation via Discord:

MELLOR: Hey bby

MELLOR: Miss u

MV1:    Wyd

MV1:    Miss you to

MELLOR: Touching my dick thinking about u

MV1:    Oh

MELLOR: Thinking how imma be rough with u, make, u feel loved

MV1:    Mhhh

MELLOR: How i Want you to tounge my tip And make me Shoot Cum at your face

MV1:    [emoji]

MELLOR: Can we Fuck on call

13

MV1:    I just woke up baby my fingers are not working right lol

MELLOR: Use the brush

MELLOR: How badly You wanna see my cock Scale 1/10

MELLOR: Do you

MELLOR: Also when im There I Really Wanna ass Fuck you would I allow me

MELLOR: Really

MELLOR: i Wanna Turn u into my little sex doll imma be honest

MELLOR: [emojis]

MELLOR: Can i see your pussy

MELLOR: I wanna Make u mess

MV1:    I have to go my love

     c.   On or about June 21, 2025, MELLOR messaged MV1 "can we fuck".

     d.   On or about June 24, 2025, MELLOR sent MV1 a photo of his penis after messaging her "I need 10 Photos of you Please", "Just send old or new". After he sent the penis photo, MELLOR messaged MV1 "Bby", "U like". MV1 responded "Mhm", to which MELLOR replied "Then fucking Call me Let me pound your insides". The same day, MELLOR messaged MV1 that he loved her and wanted to marry her calling her "[MV1'S first name] MELLOR". Later that day, MELLOR sent MV1 the following messages after sending a photo of his penis:

MELLOR: Soo who do you call with these pics

MELLOR: Cause obviously you naked But for Who not me

14

MELLOR: Cause u Just laying down

MELLOR: I trust u but this is Getting too much Bye

MELLOR: Call me, when u can Tell, the truth

MELLOR: Soo Im ignored

MELLOR: Cool Now u wonder why i cut

MELLOR: Gn

MELLOR: Just know if you cheating

MELLOR: Just send the fucken Video right now

MELLOR: Im Crying and crying

MELLOR: Send it now

MELLOR: Be blocked

MELLOR: send it Wife

MELLOR: Or should i say angel

MELLOR: If i dont answer im Dead Good bye

MELLOR: Im over thinking sorry I need sleep

e.   On or about June 24, 2025, MELLOR messaged MV1 that he "fuck u anywhere", even in front of her mother or sister.

f.   On or about June 25, 2025, MELLOR asked MV1 to get on a call which she declined. MELLOR told MV1 that he loved her and "Yes I wouldn't mind a pussy pic though".

g.   On or about June 26, 2025, MV1 messaged MELLOR "I sent it but deleted it cause you know I don't send I do it on call with you". MELLOR responded, "I didn't see Let me see", "Real fast", "I love your V", and "such a sexy Pic".

h.   On or about June 30, 2025, MELLOR messaged MV1 "Yeah Waiting for you to call me ask me clap you pussy".

15

i.    On or about July 4, 2025, MELLOR messaged MV1 "When I turn 18 Do you wanna End things". MV1 responded that she was too young to understand, to which MELLOR responded, "Im too Old For you You need find a Guy your age".

j.    On or about July 4, 2025, MELLOR became upset with MV1 stating that her missing another man was a form of cheating, the conversation then continued to the following:

MELLOR: Post me Or im gone Nothing ever Changes I wanna Be see as yours not your posts on how your leaving the world

MELLOR: Do you not even See where your wrong

MELLOR: Say what you wanna say

MELLOR: Im muting soo I dont yell Over u

MELLOR: Fuck what

MELLOR: No im muting cause imma yell At you

MELLOR: Yeah I know Im like your mom and im like you exs

MELLOR: I give up

MELLOR: Fuck this

MV1: I told you to fucking talk

MELLOR: You know what Sounds like you 100% happier Before you knew me

MELLOR: Bye That's kinda fucked up

MV1: Join the fucking call back

MELLOR: Im posting all this have Fun getting a mans

MV1: Have fun with your little whores

MELLOR: Anwser now

MV1: Bye

MELLOR: Your nudes are going out

16

MELLOR: Have Fun Slut

MELLOR: i cant believe you

k.    Later in the messages, MELLOR told MV1 that he was going to kill himself and stated he would not post her nude photos.

l.    On or about July 5, 2025, MELLOR messaged MV1 "Yeah just woke up heard asf", "Love you mommy", "I wanna fuck you", and "U Free to make me cum".

i.    On or about July 8, 2025, MELLOR messaged MV1 "U in the mood", to which MV1 responded she can call but she was still in bed. MELLOR responded, "Will u Rub that pussy", and "You like that".

m.    On or about July 19, 2025, MELLOR messaged MV1 "I have A FEELING I MIGHT Get your prego" to which MV1 responded "Idc but I'm gonna wrap my legs around you while your fucking me and pull you in closer". MELLOR then messaged MV1 "I wanna fill you up", Show me that pussy bby", "Bby", and "You there", to which MV1 responded for him to check Snapchat.

n.    On or about July 27, 2025, MV1 sent MELLOR a photo of a campsite. MELLOR messaged MV1 "Soo how we Gonna fuck" and inquired if it would be in her tent, to which MV1 responded she would call him when she got back him.

o.    On or about August 1, 2025, MELLOR messaged MV1 that he was thinking about "u and me need to meet up". MELLOR again stated they need to meet up and see each other, to which MV1 responded she would love to, but she is not 17 yet.

17

p.   On or about August 2, 2025, MELLOR threatened to kill himself and messaged MV1 "Btw Careful what you say I have a gun in my hand" and "Only Need Three bullets Soo hear ill let you have proof" and then sent an audio message that appeared to be distorted audio of a gun.

q.   On or about August 4, 2025, MELLOR called MV1 an online bully, to which MV1 stated that her mom doesn't like MELLOR and that she had seen their messages. MELLOR responded "But ngl When I get My Motor Cycle imma come be At your Ass yeah u a lesson". MV1 responded good luck, to which MELLOR responded, "Soo Hope u handle pain well", "I have your address Dumb fuck", and "Ill see you in couple months". MELLOR then told MV1 that maybe that would change her mind and she will hug him and say she's sorry.

r.   On or about August 11, 2025, MELLOR told MV1 that he was going to kill himself and sent photos of bloody wrists. MELLOR told MV1 that she was the only girl he ever loved and that he wanted to get back together.

s.   On or about August 15, 2025, MELLOR messaged MV1 "bby", "call can I fuck u". When MV1 responded that she wasn't home, MELLOR asked to call that night.

22.  On or about August 17, 2025, MELLOR and MV1 exchanged greetings and MELLOR thanked MV1 for staying with him the night previously and that it made him so happy. MV1 responded that she was happy it helped him and MELLOR stated he wanted to do it again that night.

18

23.  The conversation thread on Discord ended on or about August 24, 2026, with MV1 messaging MELLOR "Hi" but did not receive a reply.

F.  MINOR VICTIM 2 ("MV2")

24.  As described above, MV2 is a now 13-year-old girl residing in Tennessee. On or about January 11, 2025, MV2's mother sent MELLOR a copy of MV2's vaccination records, which detailed her date of birth and therefore MELLOR was aware of her true age by that date. Moreover, S.G. indicated the reason she sent records to MELLOR was because he had previously been told MV2's age and he claimed to not believe MV2 nor her mother on prior occasions.

25.  On or about June 4, 2026, MV2 was interviewed via CAFI and provided the following information:

a.  MV2 did not recall exactly when she began speaking to MELLOR, but she was either 11 or 12 years old. MV2 initially told MELLOR that she was 15 years old but later told him her real age. When MV2 told MELLOR that she was 12, he didn't care.

b.  MELLOR was not honest about his age. MELLOR frequently changed the age listed in his biography on social media and varied between approximately 16 – 18 years old.

c.  MV2 and MELLOR met on WePlay.[8] The initial interaction was more of a mentorship and friendship. MELLOR was like a best friend to MV2 and then later became her tormentor.

---

[8] WePlay is an online application that has online games and messaging functions.

19

MELLOR groomed MV2 and slowly transitioned the relationship to be sexual by asking her inappropriate questions.

d.    At some point, the conversation transitioned to Discord and Instagram. MELLOR asked MV2 to transition the conversation to Discord and Instagram.

e.    MELLOR told MV2 what kind of photos to send him. MELLOR asked for photos of MV2's breasts and "private parts". Sometimes, MELLOR asked for MV2 to send photos of her genitalia with her face in them. MV2 sent approximately 10 photos of her breasts and seven photos of her genitalia to MELLOR on Instagram. MV2 also sent one or two videos of her genitalia to MELLOR on Discord. They also engaged in approximately 30 explicit video calls.

f.    During the aforementioned video calls, MELLOR told MV2 to finger herself while MELLOR masturbated. MV2 could see MELLOR's genitalia on the video call. Later, MV2 found out MELLOR took a screenshot of the video call because MELLOR sent the screenshot to a minor female friend of hers, who showed MV1 the photos that MELLOR sent her.[9]

g.    MV2 was forced to send explicit images of her genitalia to MELLOR. MELLOR threatened both her and her family. MELLOR sent MV2 death threats and told her to kill herself. MELLOR contacted MV2's mother, as well as sent explicit images of her to another minor who was friends with MV2. MELLOR also threatened to send other explicit photos of her.

---

[9] At the time of this affidavit, the friend has not been interviewed.

h.    MELLOR also spoke to one of MV2's friends, who was younger than her. MELLOR said inappropriate things about MV2's friend. Initially, when MELLOR and MV2 first started talking on Discord, MELLOR asked MV2 if the minor wanted to "do it with us", to which MV1 told MELLOR to leave her out of it. MV2 also knew that MELLOR attempted to get that minor friend to "do some stuff", but she said no. Later in the CAFI, MV2 detailed that MELLOR wanted MV2 and her minor friend to do the same thing he was "making" her do, but "together" with the minor friend. The minor friend told MELLOR no. MV2 was also aware of MV1 and that MELLOR also communicated with MV1.

i.    MELLOR told MV2 to kill herself multiple times. MV2 began self-harming and even attempted suicide.  MELLOR's threats were a trigger for MV2. MV2 frequently hurt herself after MELLOR made her engage in sexual acts.

j.    MELLOR spoke to MV2 about flying to meet her in person. MELLOR had MV2's home address. MELLOR suggested that they meet at the park by her house. MELLOR stated his plan was basically to rape MV2 at the park by her home.

k.    MELLOR communicated more on Discord than on Instagram. MV2 created a Discord account to communicate with MELLOR.

l.    MELLOR would want to engage in sexual video calls with MV2, which she didn't want to do. Sometimes, MV2 was able to tell MELLOR no, but on other occasions she wasn't able to. When MV2 said no to MELLOR, he would get angry. MELLOR would beg

21

MV2 to do what he wanted and if she still didn't, he would curse her out.

m.   MV2 sent MELLOR explicit images and engaged in sexual calls on Discord. MELLOR also wanted MV2 to engage in sex acts with another minor on Discord, but that minor declined.

n.   MELLOR began threatening MV2, to include contacting her mother, approximately 12 – 15 months prior to the CAFI. Approximately 12 months ago, MELLOR began threatening to send images to MV2's father.

o.   MV2's mother sent MELLOR a copy of MV2's birth certificate to prove her age.

p.   MELLOR tried to get MV2 to masturbate with a hairbrush.

q.   MV2 told MELLOR that what he did to her was reported to the FBI. After learning about the FBI investigation, he started talking to MV2 off and on at least two additional times after.

r.   On or about May 16, 2025, MELLOR messaged MV2 via Discord "are you free too have sex on call". MV2 was shown an image of the conversation during the CAFI, to which she responded that it was "proof" about what he asked her to do.

s.   MV2 was shown several screenshots of conversations between herself and MELLOR on or about October 6, 2025, following MELLOR learning about the FBI investigation. MV2 described the messages as MELLOR lying to her and trying to convince her that his accounts weren't actually him. In the messages, MV2 told MELLOR that she wasn't going to lie. MELLOR

22

tried to trick MV2 into thinking the other accounts weren't his and then threatened that she would get arrested. MV2 believed that MELLOR was clearly lying to her because he was worried about getting into trouble.

t.   MV2 was shown image file name "(591) Discord _ @⸱☆Δ×V4MP×Δ☆⸱ - Opera 6_1_2025 7_21_06 PM.png", which she positively identified as being from a Discord video call in which she and MELLOR were both masturbating. The image depicted MV2 at the top of the screenshot. MV2 was visible from the neck down, nude, with her breasts exposed. MV2's hand was in front of her vagina, appearing to be masturbating.[10] MELLOR was visible at the bottom portion of the video call and appeared to be masturbating.

26.  MV2 was shown image file "PART1755478199296_image000000.jpg" taken on or about August 13, 2025 and observed on MELLOR's cellphone. The file was a closeup image of a vagina, with fingers on top of it. MELLOR previously identified the image as being a screenshot from a video call between himself and MV2. During the interview, MV2 positively identified the image as being of her and she stated that she wrote the word "STAR" on her hand, which is partially visible in the image. MELLOR also sent the aforementioned image to MV2's mother, S.G., via text message on or about August 17, 2025. MV2

---

[10] As described in greater detail below, approximately six screenshots of the video call were taken, that were all similar in appearance. Only the one image was shown in the CAFI due to the fact they were all so similar.

23

stated that MELLOR also sent the image to a female minor friend of hers.

27.  MV2 identified image file "PART_1755478168066_image00000.jpg" as being of her when she was either 12 or 13. The file was a close-up image of MV2's vagina. MV2 indicated she did not send MELLOR any more CSAM after that image.

28.  MV2 was shown two additional images of CSAM, filenames "PART_1755478401871_image00000.jpg" and "SPOILER_IMG_6897", as well as one non-CSAM image "IMG_7911". The three detailed images were obtained from MELLOR's cellphone, and image file "PART_1755478401871_image00000.jpg" was sent from MELLOR to MV2's mother on or about August 17, 2025, therefore the images were believed to be of MV2; however, MV2 indicated that it was not her. MV2 identified the non-CSAM image as depicting a minor friend of hers, who has not yet been interviewed at the time of this affidavit.

29.  I observed the following messages and images on MELLOR's cellphone:

a.  On or about August 13, 2025, MELLOR took a screenshot of a Discord video call between himself and MV2. MV2's display name, "V4MP", is observable at the top portion of the screen. The image is the same CSAM image described above that MELLOR confirmed from a video call between himself and MV2 where they would show their genitalia to one another. I observed that on or about August 17, 2025, MELLOR sent approximately four different CSAM images of MV2 to S.G.

24

30.  On or about November 21, 2025, while reviewing MELLOR's cellphone, I saw evidence that MELLOR used email address killerkenny987@gmail.com and Discord username "dvoraps69" on the device. I conducted law enforcement database checks for email address killerkenny987@gmail.com and observed CyberTipline submissions 218257457 and 218263465 were submitted to NCMEC by Discord based on messages that occurred on or about August 18, 2025.  More specifically, Discord indicated that the messages included "online enticement of children for sexual acts."  Discord provided a portion of those messages, which I reviewed and confirmed that the messages were not on MELLOR's cellphone.[11]  While reviewing the messages within the CyberTipline submissions, I observed that MELLOR was engaged in the following conversation with MV2:

MELLOR:   ill show her all the picks i have of u ect

MELLOR:   should have fucken listened

MV2:      Bro what

MV2:      I did listen

MELLOR:   nope

MELLOR:   join on ur alt

MELLOR:   also ur mom is in Tennessee right now right

MELLOR:   the number says Tennessee

---

[11] I have separately and independently reviewed these reports without a warrant.  This is because the private search exception to the warrant requirement applies here where representatives from Discord reviewed the files of their own volition.  See United States v. Rosenow, 50 F.4th 715, 730 (9th Cir. 2022).

25

```
MV2:      Mhm

MV2:      Yup

MELLOR:   kk

MELLOR:   bye thief

MV2:      what r u gonna do, go to Tennessee?

MELLOR:   no

MELLOR:   im calling her

MV2:      Exactly

MV2:      Bruh

MELLOR:   and texting her all the photos

MV2:      Of what?

MELLOR:   im making sure right numb

MELLOR:   ur nudes

MELLOR:   I screen shotted u

MV2:      Why do you even have those saved?

MV2:      Those are old

MELLOR:   huh old

MELLOR:   funny I think they from to nights ago

MV2:      Wdym?

MV2:      I never sent you any nudes?

MELLOR:   Ur right

MELLOR:   I just have this

MELLOR:   Ur choice

MV2:      I HAVENT DONE ANYTHING TO YOU

MELLOR:   yeah u have

MV2:      WHY ARE YOU EVEN STILL TALKING TO ME

MELLOR:   im asking nicely and u think im joking
```

26

MELLOR:    cause u have my shit

MV2:       LIE AGAIN YOU CALLED ME FUSSING AT ME

MELLOR:    all good ask me a dumb question u mom will see

MELLOR:    no I wouldn't have if u leave me alone

MV2:       Hey guess what your 19 turning 20 and I'm 13

MELLOR:    give me all my shit on ur alt

MELLOR:    u think u funny

MELLOR:    and ill call mom and tell her u do this too a lot of men

MV2:       no I don't

MV2:       You force me to

MELLOR:    u got 30 seconds call me or ill actually call real real

MV2:       Bro I don't have anything else of yours

MELLOR:    ur choice

     a.    The messages were consistent with the information previously provided by MV2 and her mother.  More specifically, MV2's mother, S.G., had previously reported that MELLOR extorted her daughter and sent CSAM of MV2 to S.G. when MV2 didn't do what MELLOR told her to do.

     b.    While reviewing MELLOR's computer, I observed that on or about June 2, 2025, MELLOR took six video captures of a video call on Discord between himself and MV2. As described above, the images depicted MV2 nude, and with her hand in front of her genitalia appearing to be masturbating. MELLOR's penis was visible in the bottom portion of the screenshot and appeared to be masturbating. Two of the images showed the same

aforementioned portion of MV2, but without the MELLOR at the bottom portion of the screen because the video call was minimized and MELLOR's Discord application was visible in the background. The background showed MELLOR was actively in a video call with MV2.

G.    MINOR VICTIM 3 ("MV3")

31.  MV3 is a now 13-year-old girl residing in Hawaii. MV3 was identified based on messages discovered on MELLOR's cellphone. Based on my review of the messages, MELLOR would have been aware of MV3's age on approximately March 7, 2025. As described in greater detail below, on or about March 7, 2025, MV3 sent MELLOR a photo of herself in her school uniform. In the photo MV3 sent MELLOR, she appeared visually consistent with her age, and her school uniform appeared consistent with being in middle school or possibly early high school.

32.  On or about June 4, 2026, MV3 was interviewed via CAFI in Hawaii. MV3 provided the following information:

a.    MV3 met MELLOR through a friend on Discord. Initially, MV3 and MELLOR spoke on Discord. MELLOR and MV3 then began speaking on Snapchat. MELLOR quickly started asking MV3 to be his girlfriend and was affectionate.

b.    MV3 told MELLOR that she was 13 years old, even though she was actually 11 or 12 years old at the time. MELLOR knew that MV3 was younger than him. MV3 had sent MELLOR a photo in her school uniform and MELLOR asked questions about her school, such as questions about her school schedule. MELLOR and MV3 also had a mutual friend who also believed that MV3 was 13

28

years old. As described in greater detail below, after MV3's birthday, MELLOR contacted someone he believed to be MV3's mother.  This individual told MELLOR that MV3 was 14-years-old, which aligned with MELLOR believing that she was 13 prior to her birthday.

c.    Eventually, MV3 agreed to be MELLOR's girlfriend, after he persistently asked. MV3 didn't want to be his girlfriend, but she felt like she had to.

d.    MELLOR was very sexual once they got into a private call. Everything was fast paced and uncomfortable for her at that age.

e.    MELLOR was direct in asking MV3 for explicit photos. MV3 now believes MELLOR utilized guilt and manipulation to get her to send explicit images. MELLOR would ask her to please send him explicit images.

f.    MELLOR would say that he was going to cry or say that he was going to kill himself. MV3 would then send the photos, and he would tell her he loved her. MV3 tried to create excuses but MELLOR kept begging for photos of her.

g.    MELLOR asked MV3 to send photos of her breasts and genitalia. MELLOR also sent explicit photos of himself back.

h.    MV3 felt like if she did not send the images to MELLOR, he would hurt himself. If MV3 didn't respond in a certain period of time, he would threaten to hurt himself, even when she was busy at school.

i.    MELLOR told MV3 that he was in middle school or high school, but MV3 thought it was odd that he wasn't even in

29

school when she was. MV3 was aware that MELLOR lived in California.

j.    Eventually, the conversation between MV3 and MELLOR transitioned to text messages.

k.    At one point, MELLOR told MV3 that if his dad found out, he would kill him. That led MV3 to believe MELLOR was actually older than he initially told her. MV3 believed MELLOR was around 16 years old. MELLOR kept telling MV3 different ages over the years; however, she eventually learned that MELLOR was 19 or 20.

l.    MELLOR asked for nude photos of MV3. MELLOR asked MV3 to touch herself while in video calls. Sometimes, while on video calls, MELLOR asked to see her touching herself.

m.    MV3 sent photos of breasts and vagina to MELLOR. MV3 took the photos on her iPad and sent them to MELLOR. MELLOR requested specific photos of MV3 naked and would instruct her to lock her door or go to the bathroom.

n.    MELLOR sent MV3 videos of him masturbating and/or asked for her to send them back. MELLOR would ask MV3 for photos/videos to masturbate to.

o.    MELLOR spoke with MV3 about meeting in person. MELLOR discussed flying MV3 to see him. MELLOR wanted to send MV3 gifts and asked for her address, but she gave him a fake address.

p.    MV3 was shown image file "PART_1742887956456_image000000.jpg". MV3 was pretty sure that

30

the three close up images of genitalia were hers. MELLOR would ask for photos and videos and MV3 recalls sending them.

q.    MV3 was shown image file "clip", filepath "/1742103507342/clip" and stated she believed it was from one of the video calls where MELLOR would ask her to show her body and do things to it. MELLOR did not tell MV3 that he took a screenshot or recording.

r.    MV3 identified image file "PART_1742887954522.image000000.jpg" as including an image of her sister and nephew. MV3 sent the image to MELLOR because he asked to see her family. The screenshots were from messages MV3 sent MELLOR on a platform that she cannot recall the name of.

s.    MV3 identified an image file of a penis sent from MELLOR to MV3 via text message as being a photo of MELLOR's penis. MV3 stated it was one of the out-of-the-blue photos MELLOR would send to her.

t.    MV3 stopped speaking to MELLOR in approximately April 2025 because her parents became aware of their messages. MELLOR contacted one of MV3's friends via Discord and inquired about MV3 and what she was doing.

33.    While reviewing MELLOR's cellphone, I observed numerous conversations with and CSAM of MV3, to include the following:

a.    Between approximately March 7, 2025, through April 14, 2025, MELLOR and MV3 exchanged numerous text messages.

31

On or about March 7, 2025, MV3 sent MELLOR a photo of her in her school uniform, with the school logo visible.[12]

b.    On or about March 14, 2025, MELLOR messaged MV3 "If I cum want me send it too you". MV3 replied sure, to which MELLOR responded, "Okay Love you", and later sent an image of a penis, presumably his. MELLOR also sent MV3 a screenshot of an image of MV3 with "my Wife" listed overhead and detailing that they had "been together" since December 3, 2024, for three months and 11 days.

c.    On or about March 14, 2025, MELLOR asked MV3 "Also you show my dick around", MV3 responded, "Maybe maybe not", to which MELLOR responded, "What did they say". Later in the conversation, MELLOR told MV3 "Imma clapp them Cheeks tonight" after asking when she'd be home. Later in the conversation, MELLOR detailed a sex dream he had about MV3.  As a part of this conversation, he messaged her "And That Pussy was Soo good and tight", "When I was behind you I kept Saying babe your Pussy Uhhgg".

d.    On or about March 15, 2025, a screenshot was taken on MELLOR's device that appeared to depict a video call between MELLOR and a female, later identified as MV3. The file, filename "clip", depicted a close-up image of a vagina, with fingers seen at the top portion. The bottom portion of the image, MELLOR's penis was visible.

---

[12] I reviewed the photo that MV3 sent to MELLOR in her school uniform and I believe that she appeared visually consistent with her true age.

e.   On or about March 17, 2025, MELLOR discussed gaming on WePlay and buying MV3 a ring in the game. Later in the conversation, MV3 sent a photo of her on a plane, to which MELLOR replied, "Nah you lucky I Wasnt on that plane" and "you wouldve sucked it the whole way".

f.   On or about March 17, 2025, MELLOR asked MV3 "Can we sex tonight", "Quietly", to which MV3 responded she couldn't because she was sleeping in the living room. MELLOR said they could do it there quietly, to which MV3 responded no, people would see. MELLOR responded, "who cares", "I mean I Don't Care who se es me", and "Okay will you watch me tonight". MV3 declined again, to which MELLOR responded, "Sucks you watching" and "Can we call soon". MV3 said her devices would get taken away in an hour, to which MELLOR persisted asking "Your tablet". MV3 responded that the tablet would be taken away too. MELLOR later said, "I wish I was there id slip it in".

g.   On or about March 18, 2025, MELLOR messaged MV3 "Wanna see it", to which MV3 responded "Woah you freaky deaky". Later, MELLOR again asked if anyone could see over her shoulder and "Do you wanna see it".

h.   On or about March 19, 2025, MELLOR sent a photo of a penis, presumably his, after saying "Someone wants too say hi".

i.   On or about March 22, 2025, MELLOR messaged MV3 "just know Your pica are being abused", "Pics", when MV3 inquired what, MELLOR responded, "Your pussy pics you gave me", "Have helped me Soo much". MV3 responded "Well darn", to which

33

MELLOR replied, "want Too Take more Of them But more of my dick When home". On or about March 24, 2025, MELLOR messaged MV3 "Tonight though please let moans out for me", to which the minor replied okay. The following day, MV3 and MELLOR discussed meeting MV3's parents and telling them the "truth". MELLOR asked MV3 if he could sleep in her bed and discussed wanting to marry her.

j.    On or about March 25, 2025, MELLOR sent a series of screenshots of his photos and deleted photos to MV3. Two suspected CSAM images of MV3 were visible in the photos screenshot, whereas suspected CSAM of other minors was visible in the deleted/trash screenshot. MELLOR messaged MV3 telling her "Wanna see how much of a whoreslut and How I was", "Here is my trash", before sending the screenshots of his trashed photos. MELLOR then told MV3 "And still today I'm Trying too be beMV3er cause lowkey You made me feel love", "I thought since I was used I Should use Others", "But not once since we met I thought you fake", "I hope you truly see the change in me", "I'm file Deleting them", and "Soo I never have to look back at them".

k.    On or about March 25, 2025, MELLOR asked MV3 "Bby Can I ask you for Some". MV3 replied "Some what", to which MELLOR responded, "A picture of you Ass". MV3 asked if he meant naked, to which he replied "Yea", "Or panties". Later that day, MELLOR asked her to get on Snap and asked "Can I See your Ass". MELLOR told MV3 "I Wanna fuck you" "Soo Fucken bad". MELLOR told MV3 to ask her mom if he can visit her for her birthday. Later in the conversation, MELLOR asked MV3 "Where my ass Pic".

34

l.    On or about April 5, 2025, MELLOR repeatedly messaged MV3 and asked why she blocked him. MELLOR asked if it was her mom or dad that had her phone but received no reply. MELLOR had ordered a ring for MV3 and messaged that the ring had been delivered but received no reply.

m.    Between approximately April 3, 2025, and April 8, 2025, MELLOR exchanged numerous messages with MV3's alleged mother "AUNTY", who was later identified as a minor friend of MV3. AUNTY provided an address on the Big Island for MV3. MELLOR asked for MV3's ring size to buy her a promise ring. On or about April 4, 2025, AUNTY discussed that MV3 was only 14. MELLOR told her that he was 18, to which AUNTY responded "Yes, there's a bit of an age gap between my fourteen-year-old, but that's fine!". After that conversation, MELLOR messaged MV3 that he was buying her a ring because she was his wife and asked if she could wear it at school. MELLOR then attempted to clarify MV3's address and asked her what color her house was. MV3 shifted the conversation and stated she would find out the address later. MELLOR told MV3 that the ring cost $2,000, to which MV3 stated he was an adult, so he was fine. MELLOR responded "Good girl" to that statement.

H.    MINOR VICTIM 4 (MV4)

34.    As described in greater detail below, MV4 was a 9-year-old girl residing in Iowa when she communicated with MELLOR. MV4 was identified based on messages observed on MELLOR's cellphone. All communication observed between MV4 and MELLOR took place on or about March 16, 2025. MV4 did not

provide her age directly in the message thread; however, he stated that MV4 would be 17 the following year, indicating MELLOR believed that MV4 was 16 prior to the conversation detailed below. MV4 stated in her CAFI that she met MELLOR on Roblox, which is possibly where MV4 and MELLOR discussed her age initially.

35.   On or about April 7, 2026, MV4 was interviewed via FBI CAFI and provided the following information:

a.   MV4 met MELLOR on Roblox. MV4 recalled being either 9 or 10 when she communicated with MELLOR; however, MV4 told MELLOR that she was 16. MV4 didn't think that MELLOR believed that she was actually 16 because she looked so young, so she told him she had a disorder that made her look younger. MELLOR told MV4 that he was 12 and that he lived in California.

b.   MV4 did not show MELLOR her nude body. MELLOR got mad at MV4 and threatened her and her family. MELLOR asked for CSAM of MV4. MV4 felt uncomfortable and declined, which upset MELLOR. MELLOR yelled and cursed at MV4.

c.   MELLOR sent MV4 photos of his genitalia.

d.   MELLOR didn't ask for photos of her face and only wanted photos of her body. After MELLOR threatened her, she felt like she had to send him photos; however, she did not send any photos of her genitalia.

e.   MV4 was shown an image of messages between MELLOR and MV4 found on MELLOR's cellphone in which MELLOR stated that he wanted to see her. MV4 stated that she believed MELLOR was asking for photographs of her body in that statement.

36

f.    At some point, MV4's mother saw the messages, including the photos of MELLOR's genitals and got angry.

36.    I observed the following messages with MV4 on MELLOR's cellphone:

a.    On or about March 16, 2025, MELLOR and MV4 exchanged numerous messages via text message, many of which were sexual in nature, to include MELLOR asking, "Would you have sex with me if you were here"? MELLOR sent an image of a penis, presumably his, and then messaged her "Okay now I wanna see you".  MELLOR asked MV4 if she liked what she saw and if he made her "horny".

b.    They then continued the conversation with MELLOR stating they could meet and asked if she wanted to "see it again". MELLOR continued to send MV4 sexual messages such as "Like I Wanna Suck this boy Soo bad or bad silence", "I meaning bending you o ver across a bed", and "And Pumping loads in your pussy".

c.    MELLOR asked MV4 to promise that she would be loyal, "Even When I turn 18 next year". MV4 responded that that was illegal, to which MELLOR responded, "I mean You would be 17", "1 year difference", and "Think about it".

d.    MELLOR told MV4 that he loved her and asked her to send a photo of herself. MELLOR then messaged MV4 "also its no illegal where you are look" and sent a screenshot of a Google message that indicated the age of consent was 16. MELLOR then

37

messaged her "Are of consent is 16", "Soo hypothetically If I Was orden where still good", "But im 17 dont worry".[13]

     e.    Later in the conversation, MELLOR asked for another photo of MV4 and sent a photo of a penis, presumably his. Following the penis photo MELLOR messaged the MV4 "I gotta take Care of that", "You would suck it wouldn't you", and "You a virgin".

     f.    MELLOR then asked MV4 about a "sleeping call", to which she declined.[14]

     g.    At one point in the conversation, MV4 called MELLOR disgusting and told her she was going to put their messages in his feed for her friends to see. MELLOR then said he would have her kicked out for messing with his heart, and that he would show her boyfriend. MELLOR then asked if MV4 saved his photos and responded, "Good cause the Cops gonna Show up", "I pray you didnt", "Your 16 Right", "Thats legal age of consent", "Your done for". MV4 asked MELLOR not to call the cops and said that she would do anything. MELLOR responded, "Someone is scared of Jail", "I already asked you why you tell someone you Love them", "If They en really do but you dont". MV4 continued to plea and said that she'd do anything and continued to state that she didn't want to go to jail and that it was just a prank.

---

[13] Based on the context of the messages, it appears MELLOR believed MV4 was 16; however, she was actually 9 at the time.

[14] Based on interviews with other minor victims, I am aware that MELLOR would engage in "sleep calls" in which they would be on call while sleeping, and then wake up and masturbate on camera.

MELLOR then made her promise they can do sleep calls and promise that she will show him she loves him. MELLOR then said he wanted a photo of her and that he loved her. MV4 sent a clothed photo that appeared to be of a young female, possibly pre-pubescent, and stated that she knows she looks young in the photo and she has a condition.

       h.   MELLOR messaged MV4 "Soo if your truly 16 would you mind showing me your Tits". MV4 said she couldn't at that time, but would later in the day.  MELLOR made her promise. MELLOR then messaged her "Also do you swear you Liked my cock" and that he loved her.

## I.   MINOR VICTIM 5 ("MV5")

37.  While reviewing MELLOR's cellphone, I observed the messages with a minor victim ("MV5"), later identified as a then 15-year-old girl residing in Georgia.  Based on a review of the messages and CAFI of MV5, MELLOR was aware of MV5's age on or about August 2, 2024. As described in greater detail below, during conversations that took place on or about August 2, 2024, MV5 discussed being in school, including a discussion about her teacher.  The conversation implied MV5 was a minor. On or about August 21, 2024, MELLOR and MV5 discussed being together in person, to which MELLOR said "2 years". In the CAFI of MV5, she stated she and MELLOR had discussed meeting in person and moving in together when she graduated from school.

38.  On or about March 25, 2026, MV5 was interviewed via FBI CAFI and provided the following information:

a.    MV5 met MELLOR on an unknown online game when she was 16 years old.[15] MV5 and MELLOR also played Fortnite and Roblox together and spoke via Snapchat, Discord, and cellphone.

b.    MV5 knew MELLOR as "Kenny". MELLOR told her that he was 17 turning 18 years old. MV5 told MELLOR about her school and that she was 16. MELLOR and MV5 discussed meeting up whenever she graduated from school. MV5 and MELLOR discussed moving in together with other friends once she got out of school. MELLOR also spoke with MV5 about buying a plane ticket to visit her for homecoming one year.

c.    MELLOR and MV5 spoke for several months, and she considered him to be her boyfriend.

d.    MELLOR made sexual comments towards MV5 all of the time. At some point, MELLOR began sending MV5 sexual photos of himself as well as videos of him masturbating and playing with his penis.

e.    MELLOR repeatedly asked for videos and pictures of MV5. At MELLOR's request, MV5 sent images and videos of her breasts and exposed genitalia on Snapchat.

f.    MV5 tried to "push it off" when MELLOR began speaking sexually, but she felt like if she didn't send him something, he would do something bad to her. MV5 was worried MELLOR would hurt her family.

g.    MELLOR became overbearing and controlling in their relationship, which led MV5 to break up with MELLOR. It

---

[15] Based on the dates of the messages, MV5 was actually 15 years old during the interactions.

got to a point where MV5 wasn't able to spend time with friends
and MELLOR would tell her what to do. MELLOR also made violent
statements and insinuated he had something to do with a school
shooting that happened in Georgia. Anytime something went wrong,
MELLOR would tell MV5 that she was "cooked" or done for. MELLOR
threatened MV5's family, which caused MV5 to send a photo of
guns that her family owns. MELLOR responded that the guns were
fake.

h.    When MV5 blocked MELLOR, he became upset. Despite
MV5 blocking MELLOR on multiple platforms, he kept following her
on different accounts. MELLOR told MV5 that he would pay her not
to break up with him. MELLOR also tried to contact MV5's family
members.

39.

40.  While reviewing MELLORS's phone, I observed the
following messages with MV5:

a.    Between approximately August 2, 2024, and October
20, 2024, MELLOR exchanged text messages with MV5. The female
victim was initially suspected to be a minor based on messages
she sent indicating she was in school, and conversations about
her mother. Based on the context of the conversation, the two
also engaged in messages via Snapchat and calls. Over 1,000
images and videos were observed and based on the file path, were
downloaded from iCloud (/download/iCloud Photos from [MV5's
NAME].zip/iCloud Photos from [MV5's name]. Some of the files
contained GPS data, which resolved to an approximate area in
northern Georgia.

41

b. On or about August 2, 2024, MELLOR messaged MV5 "Though I Know u would still suck it off", "Okay Now back too School lol", to which MV5 responded "Yea not while I'm at school!!!!". Later in the conversation, after telling her that he loved her, MELLOR messaged MV5 "ALSO can u watch me When u At lunch", to which MV5 responded that she would try but she has to put her phone down when the teacher is around.

c. On or about August 21, 2024, MV5 messaged MELLOR "I wanna be there with you and t Law down", to which MELLOR responded "aww babe", "we will be soon", and "2 years". MV5 replied "Ik", to which MELLOR replied "My dick Into Your back every morning", "I think we can both wait tell those days", and "Love u soo much". MV5 then told MELLOR that she was going to lie to the nurse and her mother and tell them that she threw up, to which MELLOR replied "Okay bet", and "I get too be, with my Mamas".

d. On or about August 22, 2024, MELLOR messaged MV5 "Also u safe enough", "Too look at my cock", and "Are u home". MELLOR then asked her if she could call.

e. On or about August 23, 2024, MELLOR messaged MV5 "Wanna call Later" and "Also when u Sleeping next to me suck me clean off the map in mornings". MELLOR proceeded to tell MV5 that he was naked and asked "Girl when u call can I show u How hard I am Real fast". MELLOR then told MV5 "Dont open Ig Photo tell u Home", "Or alone".

f. On or about August 28, 2024, MELLOR told MV5 about a dream he had about her being with a boy who was 15.

42

g.    On or about August 29, 2024, MELLOR sent a photo of a penis and asked "Can I jerk with u today". MV5 responded that she was on her period, to which MELLOR responded saying she can watch him and "[MINOR'S NAME] I really wanna cum in your mouth". MELLOR later messaged her "When u Home Can u Please", "Watch me bUst for you", and "I Want your mouth all over me right now".

h.    On or about October 20, 2024, MELLOR asked MV5 if she blocked him, "yeah u cooked [MV5's name]", and "too think I Had fucken Ticket and planned coming this month". MELLOR also appeared to have contacts saved for MV5's mother and cousin.

41.   While reviewing MELLOR's Discord account, pursuant to the previously described search warrant, I observed that on or about June 2, 2025, MELLOR messaged someone (the recipient information was not provided) "welp now u know why I asked [MV5's name] for nudes and the rest". In other messages, MELLOR referred to loving MV5. In a message on or about June 3, 2025, MELLOR provided MV5's true first and last name.

J.    MINOR VICTIM 6 ("MV6")

42.   While reviewing MELLOR's cellphone, I observed messages with a minor victim MV6, later identified as a then 13-year-old girl residing in California.  As described in greater detail below, during a CAFI, MV6 stated that she told MELLOR that she was 13 years old prior to transitioning the conversation to Google. The messages detailed below are from MELLOR and MV6's Google communications.

43

43.  On or about April 15, 2026, MV6 was interviewed via FBI CAFI and provided the following information:

a.    MV6 met MELLOR on Roblox. MV6 told MELLOR that she also had Discord and provided her email address.

b.    MELLOR told MV6 that he was 13. MV6 told MELLOR that she was 13, to which he responded, "that's young – young".

c.    MELLOR sent MV6 a link to speak via Google Chat. When MV6 entered the call, MELLOR had the camera pointed at himself, while he was sitting on a couch rubbing his penis. MV6 believed that MELLOR was holding the camera in one hand, pointed towards his penis. MV6 responded no and ended the chat.

d.    MELLOR sent two photos to MV6, a clothed photo and a photo of his penis.

e.    MELLOR threatened to harm himself if MV6 didn't agree to be his girlfriend.

f.    MV6 reported the messages to Google and deleted the email account.

44.  While reviewing MELLOR's cellphone, I observed the following messages with MV6:

a.    Between approximately September 7, 2025, and September 23, 2025, MELLOR engaged in conversations via Google (email and Google Chat), utilizing email address killerkenny987@gmail.com, with MV6. During the conversation, numerous messages of sexual nature were exchanged, including messages that implied MELLOR sent MV6 photos of his genitalia. For example, on or about September 7, 2025, MELLOR messaged MV7, "wanna see my long cock i know we close in age wanna see", "was

44

it nice i know ur not i know ur age and everything", and "ik but do u wanna be mines i like u [MV6] also be honest would u sit on it".

b.   On or about September 7, 2025, the following messages were exchanged between MELLOR and MV6 via email and Google Chats:

MV6: uh is this the right person if not kindly give urself dementia and forget this ^^

MELLOR: Yes, it is. hey pookie

MV6: omg hi

MELLOR: i was asking u wanna flirt

MV6: dont u have a gf/wife?

MELLOR: Not really. IM SINGLE IN WAYS

MV6: really?

MELLOR: yes do u wanna flirt and be little freaky as friends though

MV6: uh how

MV6: im so doomed i have hw to do but i keep procrastinating T^T

MELLOR: wanna see my long cock i know we close in age wanna see

MV6: see wat?

MELLOR: WHAT I LOOK LIKE I WANAN KNOW IF U THINK IM SEX HOT OR UGLY

MELLOR: yeah or no will u rate me

MV6: i dont rlly think theres a point in "rating" ppl cuz everyones tastes r different and i dont want to

45

accidentally hurt someone but if u rlly want to sure wont be online to much rn cuz doing hw

MELLOR: Girl I like you I'm trying too flirt with you I'm Your age I said I wanna show u Some do you wanna see or no

MV6: im rlly srry i dont know how to respond the longest conversation ive had with a boy other than u was for a school project

MELLOR: Do you wanna see Do you feel Emotional like horny Can I show u I really wanna

MELLOR: Ready

MELLOR: [At that point, MELLOR sent two images; however, the images were not visible in the chat thread.]

MV6: Be careful online cuz wat if i was a predator u dont even know my real name or how i sound like yet just be more careful pls

MELLOR: was it nice i know ur not i know ur age and everything

MV6: i honestly dont know how to reply but just be more careful pls

MV6: roblox is full of predators i couldve easily been one of them

MELLOR: ik but do u wanna be mines i like u [MV6'S NICKNAME] also be honest would u sit on it

MV6: im 13 im still trying to figure out my school life T^T

46

MELLOR: can i see what u look like?

MELLOR: did at least blush a little

MV6: i can call u on chat tmrw in a meeting rn

MELLOR: Okay love you

c.    On or about September 9, 2025, MELLOR messaged MV6 that he had deleted Roblox and asked her if she still wanted to be friends. The same day, MELLOR messaged MV6 "I just want a gf", to which MV6 responded "that space is for someone else im srry but go explore find someone who truly loves you and cares about you". On or about September 16, 2025, MELLOR told MV6 that he had been cutting his arms, to which MV6 responded "dont pls", and that she wanted him to get help. MELLOR responded "Uhh i want a gf".

K.    MINOR VICTIM 7 ("MV7")

45.    While reviewing MELLOR's cellphone, I observed messages exchanged between MELLOR and a minor female, later identified as MV7 a then 15-year-old girl residing in California.  While reviewing the messages exchanged between MELLOR and MV7, I observed that on or about August 27, 2025, MELLOR asked MV7 if her parents allowed her to have boys over, to which MV7 responded no because she never really asked or brought people over. MELLOR then asked MV7 about sneaking him over. Based on that information, I believe MELLOR was aware that MV7 was a minor by approximately August 27, 2025.

46.    On or about April 30, 2026, MV7 was identified and interviewed via FBI CAFI and provided the following information:

47

a.    MV7 met MELLOR on Roblox. MV7 spoke to MELLOR on Discord and the conversation transitioned to text messaging. The conversations between MELLOR and MV7 took place over approximately two days.

b.    MELLOR told MV7 that he was 18 years old and MV7 told him that she was 16 years old. MV7 believed MELLOR's first name started with an "I".[16] MV7 provided the username "doublegunsdante" for MELLOR, which had previously been identified by a different minor victim.

c.    At the time, MV7 had a boyfriend. MV7's boyfriend also met and spoke to MELLOR.

d.    MELLOR kept pushing to get information from MV7.

e.    MELLOR told MV7 his name and sent photos of himself, to include photos of his penis. MELLOR told MV7 that he loved her.

f.    When MV7 told MELLOR that she also lived in California, he asked her to meet up at a park.

g.    At some point, MV7 was upset and blocked MELLOR online. MV7 had a boyfriend at the time. MELLOR found MV7's boyfriend online and started sending him messages with screenshots of conversations between MELLOR and MV7

h.    MV7 checked her blocked users and observed that he had deleted his account.

47.   While reviewing MELLOR's cellphone, I observed the following messages exchanged between MELLOR and MV7:

---

[16] I am aware from the investigation that MELLOR often went by the name "Itachi".

a.    Between approximately August 27, 2025, and August 28, 2025, hundreds of messages were exchanged via text message.

b.    On or about August 28, 2025, MV7 spoke about being homeschooled, indicating she was still a minor.

c.    On or about August 27, 2025, MELLOR messaged MV7 "Question U know if I show it to you its gonna make me wanna Be yours", "Fuck u", and "And Marry u". MELLOR told MV7 that he was a virgin, wanted to have her children, and that he has "a 11 inchs cock". MELLOR described wanting a relationship with MV7, to include cuddling, hugs, kisses, "and in Time sex".

d.    On or about August 27, 2025, MELLOR asked MV7 if she wanted to see his genitalia and sent images of a penis, presumably his. MELLOR described "jerking it" and "My penis Grows At Your Words thanks alot" to MV7.

e.    On or about August 27, 2025, MELLOR sent videos of himself masturbating with messages like "Itd help I see u naked but u dont wanna yet".

L.    MINOR VICTIM 8 ("MV8")

48.    While reviewing MELLOR's cellphone, I observed messages exchanged between MELLOR and a minor victim, later identified as MV8, an 11-year-old girl[17] residing in Texas.

49.    On or about May 19, 2026, MV8 was interviewed by FBI CAFI in Texas and provided the following information:

a.    MV8 was shown a photo of MELLOR and declined knowing him.

---

[17] MV5 was 11 years old and turned 12 years old when the last message in 2025 was sent to her.

49

b.   MV8 recalled communicating with an unknown person and did not recall the application she communicated with him on. MV8's friend possibly added him on Google Meet and began texting her. MV8 also spoke to a different man on Instagram.

50.   While reviewing MELLOR's cellphone, I observed the following messages exchanged between MELLOR and MV8:

a.   Between approximately June 12, 2024, through June 13, 2024, multiple images were exchanged between MELLOR and MV8.

i.   MV8 sent image 740022053, which is a close-up image of MV8's vagina, to MELLOR on or about June 13, 2024.

ii.   MV8 also sent photos of her face and breasts to MELLOR, as well as a video of MV8 dancing in her underwear.

iii. MELLOR sent MV8 a shirtless photo of himself and a photo of a penis, presumably his.

b.   On or about August 17, 2025, MELLOR messaged MV8 "Hey bby".

M.   MINOR VICTIM 9 ("MV9")

51.   While reviewing MELLOR's cellphone, I observed conversations and images between MELLOR and a minor victim that has since been identified as MV9, a then 16-year-old female residing in Alabama as detailed below.

52.   At the time of this affidavit, MV9 has not been interviewed.

53.   While reviewing MELLOR's cellphone, I observed that between approximately June 9, 2025, and June 10, 2025, MELLOR and MV9 exchanged hundreds of messages. MV9 also sent images of her breasts, exposed genitalia, and face. Prior to sending

MELLOR CSAM on or about June 9, 2025, MV9 spoke about moving to a place where she'd have her own room.  She also told MELLOR that she could not send him CSAM because she shared a room and bathroom with her siblings and parents. Based on those facts, I believe MELLOR was aware that MV9 was a minor on or about June 9, 2025, prior to the first CSAM file being sent. I observed the following messages and images on MELLOR's cellphone:

a.   On or about June 9, 2025, MV9 sent a photo of her face to MELLOR.  The image appeared visually consistent with MV9's age of 16. Following that message, MV9 stated she couldn't talk because she was moving to a place where she would get her own room. MELLOR responded "ohh Soo Does that mean I Can have u Call me and finger that pussy". MELLOR discussed wanting to marry MV9 and stated "Yeah Im also Gonna make you cum Tonight".

b.   On or about June 9, 2025, MV9 sent image file "PART_1749527371747", an approximately 22 second video that appeared to depict her hand underneath her underwear or pants, rubbing herself. Her genitalia was not visible in the video due to her clothing, but the minor appeared to be masturbating. Prior to sending the video, MELLOR messaged MV9 asking her to send him CSAM. For example, MELLOR messaged her "send me your pants view like the area", "I wanna see, you pussy lips soo Bad", "You roll over and put your Phone down there", and "Send me a video of u rubbing it". MV9 told MELLOR that her younger sister, who was nine years old, and older sister who was 18 years old were in the room. MELLOR coached the minor to roll over and masturbate while the nine-year-old was in the room, or

51

to go to the bathroom. When the minor suggested it would be too dark, MELLOR told her to use flash.

      c.   After MV9 sent the aforementioned video, MELLOR messaged her "Show me it", and "Take them off your panties", "Can i make u squrit in there", and "Still rubbing it". MELLOR sent a video of himself masturbating and asked "Do you think i Can see more btw" and "Im Still Rubbing my Dick". MELLOR then messaged the minor "you Send me that Juicy Pussy", "Give me A, couple vids", and "Like you Shaking you Ass too".

      d.   MV9 then sent image "PART_1749530079457", a close-up image of her exposed vagina. MELLOR responded, "Finger it", "please Mommy", and "That's soo yummy looking".

      e.   MV9 then sent filename "PART_1749530220953", an approximately 27 second video depicting her rubbing her genitalia with her fingers. MELLOR instructed the minor to "keep going", "shake that Ass bby", and that he was going to "jerk" with her.

54. On or about March 31, 2026, MV9's father, J.S., was interviewed by law enforcement. J.S. was shown a photo of MV9 from MELLOR's cellphone and he confirmed the photo was of his daughter and provided her date of birth. J.S. also confirmed that the phone number used to communicate with MELLOR was MV9's phone number.

N.   MINOR VICTIM 10 ("MV10")

55. While reviewing, MELLOR's cellphone, I observed messages and images exchanged between MELLOR and a minor female, later identified as MV10, a then 17-year-old girl in North

Carolina, as described in greater detail below.  At the time of this affidavit, MV10 has not been interviewed.

a.    Between approximately December 18, 2024, and December 24, 2024, MELLOR and MV10 exchanged multiple messages and photos. MELLOR told MV10 that he loved her and talked about dating her. MELLOR referenced sending her a photo several times. MV10 told him not to. Later in the conversation, and unprompted, MELLOR messaged MV10 "I'm taking a photo for you", "Of my Cock". The minor responded "why" to which MELLOR responded, "I want you too tell me could you handle 10 inchs". MV10 responded that she "handled 11 inches at 16". MELLOR then told MV10 to rub herself and asked her about her favorite sex positions.

b.    On or about December 18, 2024, MV10 sent a photo of her buttocks in underwear, to which MELLOR responded with messages such as, "I feel like I'mma pop" and "God if your ass is like that your pussy must be soo good". MELLOR then asked MV10, "Can i see" and "Make me cum". MV10 then sent MELLOR image "PART_1734561336169", which depicted what appeared to be a minor female, nude from the waist down. The female's face was not visible in the image. MV10 then responded, "That's all you're getting u ain't getting the full thing yet", to which MELLOR responded, "I just got back in my room and cummed on my bed" and "Wanna see", before sending her a photo of a penis, presumably his.

56.  On or about March 26, 2026, an individual, with whom MV10 lived with while she was 17, positively identified an image

53

of MV10 found on MELLOR's phone. The woman also provided MV10's full name and identifying information. MV10 is now an adult.

O.    MINOR VICTIM 11 ("MV11")

57.    While reviewing MELLOR's cellphone, I observed explicit images of a minor that has since been identified as MV11, a then 14 or 15-year-old girl residing in Hawaii. At the time of this affidavit, MV11 has not been interviewed.  More specifically, I observed the following:

a.    Four images that appeared to be screenshots of videos calls between MELLOR and MV11, display name "MY QUEEN", were on the device. The minor was nude in three of the images. The fourth image depicted the minor showing an address on an envelope, which is how she was identified.

i.    The three nude images of the suspected minor appeared to be screenshots from video calls, in which MELLOR could be seen as the other user in the call.

ii.    Image 1707630799474 depicted the female, username "MY QUEEN" visible at the top of the screen, fully nude, with her genitalia partially covered by the icons at the bottom of the screen.

iii. Images 1707594408009 and 170763058453 depict the minor topless, with MELLOR also visible on the screen.

iv.    Based on the file paths, all of the images were screen captured on that device.

58.    On or about March 18, 2026, MV11's mother was shown an image of MV11 from MELLOR's phone, which she positively identified as her minor daughter.

54

P.    MINOR VICTIM 12 ("MV12")

59.    On or about February 24, 2026, I was contacted by MV2's mother, S.G., who informed me about an "investigator" who was looking into MELLOR and provided me with his information. The same day I contacted the individual, T.S., who informed me that he is part of an online group who has been investigating MELLOR after being contacted by one of his victims. T.S. informed me that MELLOR had been in contact with a 15-year-old girl in Oregon. T.S. provided me with the minor victim, MV12's, mother's contact information.

60.    Later that day, I was contacted by another individual, D.T., who described himself as being a part of the same online community group as T.S. D.T. stated the group tries to report pedophiles. More specifically, D.T. indicated that they create "safe rooms" for minors and alternate accounts posing as minors. D.T. stated that he had caught MELLOR in the safe rooms only for minors, and messaging the "minor" accounts on several occasions.

61.    On March 2, 2026, I interviewed MV12's mother, R.M., and learned the following:

        a.    R.M. knew about a 20-year-old man who was pressuring MV12 to be in a relationship with him.

        b.    The man, later identified as MELLOR, sent MV12 explicit videos of himself masturbating on Snapchat.

        c.    R.M. did not know if MV12 has sent explicit photos of herself to MELLOR.

62.    On March 19, 2026, MV12 was interviewed via CAFI and disclosed the following:

55

a.    MV12 identified communications between herself and MELLOR, whom she referred to as "Kenneth".

b.    MV12 identified screenshots of Snapchat conversations between herself and MELLOR in which MELLOR told her he loved her and asked if she told her friends about him. MELLOR also sent photos of his face to MV12.

i.    MV12 has previously provided screenshots of conversations between herself and MELLOR. One of the screenshots depicted MELLOR sending  MV12 messages such as "Baby Thanks soo much I love it", "Is that all u did mamas", "You deserve it", "Lick it like a lilipop", "Im on weplay", "I love you soo much I may not be the best bf", "But I try I don't deserve a wife like you", "No one will ever be better", "I love you [MV12's name] and your my World and", Existence I love you forever and ever", and I love you babe".[18]

c.    At another point in the conversation, MELLOR told MV12 "Ik soo we wait until ur 18" and "Too meet up", and then "Unless we meet up rn and not do anything weird". [19]

---

[18] A date was not visible on the message.

[19] A date was not visible on the message.

## V.    CONCLUSION

63.  For all of the reasons described above, there is probable cause for the requested complaint and arrest warrant against KENNETH MELLOR for violations of 18 U.S.C. § 2251(a),(e) (Production of Child Pornography) (the "SUBJECT OFFENSE").

/s/
_____
CHELSEA MALONE, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 23rd day of June, 2026.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

57

# EXHIBIT 1

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California



FILED
CLERK, U.S. DISTRICT COURT

OCT 16 2025

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| THE PERSON OF KENNETH MELLOR, AS FURTHER DESCRIBED IN ATTACHMENT A-2 | ) ) ) ) ) | Case No.  2:25-MJ-06437 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-2*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 2252A(a)(2) | Receipt and Distribution of Child Pornography |
| 18 U.S.C 2252A(a)(5)(B) | Access with Intent to View and/or Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Chelsea Malone*
_____
*Applicant's signature*

Special Agent Chelsea Malone, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 10/16/2025

Judge's signature

City and state: Los Angeles, CA

Honorable Jacqueline Chooljian, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Chelsea Norell (x2624)

**ATTACHMENT A-2**

**PERSON TO BE SEARCHED**

The person to be searched, including the property that is on his person, is KENNETH MELLOR (the "SUBJECT PERSON"), date of birth 02/07/2006, depicted below.  The SUBJECT PERSON is about 5'11", 125 pounds, with blonde hair and blue eyes.  The search of the SUBJECT PERSON shall include the following: any and all clothing and personal belongings, any digital devices, bags, or other containers carried or held by the person, or within the person's immediate vicinity and control at the time and location that the search is executed.



i

**ATTACHMENT B**

## ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography) and 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and/or possession of child pornography) (the "Subject Offenses"), namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

i

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.    Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of

ii

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.    Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

l.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

iii

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

iv

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

6.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

v

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable,

vi

return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

vii

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8. During the execution of this search warrant, law enforcement is permitted to: (1) depress MELLOR's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MELLOR's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

viii

**AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as follows:

## I.    PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of an application for a warrant to search the premises located at 37608 5th Street East, Palmdale CA 93550 (the "SUBJECT PREMISES") as further described in Attachment A-1, and the person of KENNETH MELLOR (the "SUBJECT PERSON" or "MELLOR"), date of birth 02/07/2006, as further described in Attachment A-2, for violations of 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography) and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or possession of child pornography) (the "SUBJECT OFFENSES").

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.    INTRODUCTION

3.    I am a Special Agent with the FBI and have been so employed since April 2022.  As a Special Agent, I have conducted and participated in many investigations into criminal activity.

1

I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of violations of federal and state law.  In my current position, I investigate the sexual exploitation of children in the Central District of California and associated violations of federal law.

4.    I have received training in the investigation and prosecution of child pornography and child exploitation offenses.  Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children.  My training and experience have given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

## III. BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and

2

computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore,

3

viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.    Internet.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.    Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information,

4

account application information, and other information both in computer data and written record format.

e.    IP Addresses.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.    IP Address – IPv6.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP

5

addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.    The following definitions:

i.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

ii.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iii. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an

6

identifiable minor is engaged in sexually explicit conduct.

iv.    "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

v.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

vi.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit

7

electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

vii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

viii.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include

8

programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

ix.    "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

x.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xi.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xii. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xiii.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xiv. A "storage medium" or "storage device" is

9

any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xv.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xvi. A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.  SUMMARY OF PROBABLE CAUSE

7.  As set forth in greater detail below, MELLOR has engaged in an online sexual relationship with a now-13-year-old girl since approximately 2022.  In 2024 and 2025, MELLOR knowingly received Child Sexual Abuse Material ("CSAM") and sent the CSAM files to the minor victim's mother.  Accordingly, there is probable cause to believe that MELLOR committed the SUBJECT OFFENSES.

## V.  STATEMENT OF PROBABLE CAUSE

8.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

10

A.    MELLOR IS REPORTED TO THE FBI FOR SEXTORTION

**9.**    On or about October 3, 2025, R.L., a 19-year-old male, contacted the FBI to report that one of his friend's, MINOR VICTIM 1 ("MV1"), was the victim of sextortion by MELLOR.  R.L. also reported that he was aware of other victims.

10.    On or about October 6, 2025, I interviewed R.L. and learned the following:

a.    R.L. and MELLOR met in person in 2024 and began speaking online approximately eight months ago.

b.    R.L. is friends with MV1.  MV1 is a 15-year-old female who told R.L. that she had sent explicit photos of herself to MELLOR.  At some point MELLOR threatened to release the photos of MV1.[1]

c.    MELLOR told R.L. that he had a 12-year-old girlfriend, Minor Victim 2 ("MV2").

11.    R.L. did not have identifying information for the minor victims outside of their Discord usernames, but was in contact with them.  R.L. stated that he would reach out to the minors and request their information to provide to the FBI.  As described in greater detail below, MV2 called me after R.L. contacted her and provided my information.

12.    On or about October 6, 2025, R.L. emailed me screenshots of Discord messages that either discussed MELLOR or

---

[1] At the time of this affidavit, MV1 has not been interviewed. A subpoena has been served for subscriber information for MV1's Discord account in order to identify her, but a response has not yet been received.

11

included messages from MELLOR.  I reviewed the messages and observed the following:

a.    On or about August 4, 2025, MELLOR, using the Discord display name including "Lord Itachi,"[2] messaged a group chat in response to messages about 15-year-old MV1, "Idc her nudes Online I got paid for them," [MV1's first name] "is my ex," "Dumb ass," "Shes Doxxed so I paid people to go kill her."

b.    On or about August 15, 2025, MELLOR messaged MV1 "bby" and "call can I fuck u", followed by two missed calls. MV1 informed MELLOR that she wasn't home and would be later that night.

B.    IDENTIFICATION OF MV2

13.    On or about October 6, 2026, I received a telephone call from MV2 who stated that she was notified of the investigation by R.L. I conducted a minimal facts interview of MV2, in anticipation of conducting a forensic interview of MV2 at a later time.  MV2 provided the following information:

a.    MV2 is currently 13 years old.

b.    MV2 sent MELLOR nude photographs, to include photographs of her vagina.

---

[2] At the time of this affidavit, a subpoena has been issued to Discord for subscriber information for this account; however, Discord has not yet responded.  Both R.L. and MV2 positively identified this display name as being used by MELLOR, which they know because they have each spoken to him on this account over an extended period, including voice and/or video calls with MELLOR.

12

c.    MELLOR sent the explicit photos of MV2 to one of MV2's friends.

14.    On or about October 6, 2025, I received a telephone call from MV2's mother, S.G.  S.G. provided the following information:

a.    S.G. has spoken to MELLOR on several occasions.

b.    S.G. is aware that MELLOR is an adult.

15.    MELLOR sent S.G. explicit photos of her daughter, MV2.

C.    MELLOR CALLS THE FBI

16.    On or about October 6, 2025, MELLOR, utilizing telephone number 442-477-1318, made an unsolicited telephone call to the FBI Los Angeles Field Office, Lancaster Resident Agency.  MELLOR stated that he wanted to report that he was being harassed and lied about.  MELLOR initially stated that he wanted to make the report anonymously but later provided his name and telephone number.  MELLOR provided the following information:

a.    MELLOR met R.L. at a mental health facility in Florida.  MELLOR was very aggressive in his youth.  R.L. tried to hack MELLOR's accounts.  MELLOR was previously banned from Discord for catfishing, but that was when he was much younger.

b.    MELLOR is not a "pedo," but R.L. keeps posting online that MELLOR is.

c.    MELLOR knows that people are saying he distributed photographs of his genitalia, but the photographs do not depict his genitals.

13

d.    MELLOR met MV1 in Tennessee where they lived in a home together.  MV1 lied about her age to MELLOR.  MELLOR did not save explicit photos of MV1.  MELLOR stated in the Discord group chat that he sold her nude photographs to scare her, but didn't actually do it.

e.    MELLOR was forced into a relationship with MV1 because her mother, S.G., wanted him to scare her because he was an adult.  S.G. is good friends with MELLOR's father.  Whenever MV1 sent MELLOR nude photographs, he blocked her.  MELLOR did send the nude photographs to S.G., but only to show her mom what she was doing.

f.    MELLOR discussed a third minor victim who has not been identified at this time.  MELLOR indicated that he believed his account was hacked and that R.L. or someone else was chatting with her.

g.    MELLOR believed his account was hacked because when he reviewed the recent logins to his account, some of the IP addresses showed as being located in the Van Nuys area. MELLOR claimed he didn't know where Van Nuys is.[3]

i.    I explained to MELLOR that when accessing a social media account from a cellphone, the IP address location is not exact and often shows Los Angeles or somewhere in the greater Los Angeles area.  MELLOR then stated that he does not use social media, outside of Tiktok, on his cellphone.  MELLOR only uses Discord on his computer.

---

[3] R.L. resides in Humbolt County, CA; whereas, MELLOR resides in Los Angeles County.

17.   On or about October 6, 2025, MELLOR called the FBI National Threat Operations Center (NTOC) on a recorded line. During the call, he provided his name and phone number, telephone number, 442-477-1318. MELLOR stated that R.L. hacked his accounts.  MELLOR admitted that he previously spoke to two minors, but claimed that he didn't talk to them anymore.  MELLOR and his father theorized that R.L. is messaging minors pretending to be MELLOR.

**D.    MV2 CONTACTS THE FBI TO WARN THAT MELLOR REQUESTED SHE DELETE EVIDENCE**

18.   On October 6, 2025, while speaking with MELLOR on the phone, I received a phone call from MV2.  I called her after my call my MELLOR ended, and she stated that she told MELLOR about the report to the FBI and that he had requested she delete his messages.  MELLOR had previously told MV2 to delete messages between the two.

19.   Later that night, I received an email from MV2.  The email consisted of a screenshot of a conversation between MV2 and another suspected minor victim, MINOR VICTIM 3 ("MV3").  I reviewed the screenshots and observed the following:

a.    MV3 messaged MV2 saying that MELLOR had reported MV3 and MV2 to the FBI.  MV3 theorized that MELLOR was retaliating against MV3 for calling him a "pedo."

b.    Relaying information she learned from MELLOR, MV3 told MV2 that MELLOR had a photograph of MV2's birth certificate and that MV2 had previously told MELLOR that she was 18.  MV2

15

denied ever telling MELLOR that she was 18 and explained that her mom sent him MV2's birth certificate.

E.    MV2'S MOTHER REFUTES MELLOR'S STATEMENTS

20.   On or about October 9, 2025, I conducted a follow-up interview of S.G. and learned the following:

a.    S.G. believed that MELLOR was 16 years old when he started speaking to MV2 in approximately 2022.

b.    S.G. does not know MELLOR's father and never asked MELLOR to date her daughter.  When S.G. learned that MELLOR was an adult, she was upset.  MV2 had mental health issues and S.G. didn't want to take a friend away from her, but she did not want an adult taking advantage of her.  MV2 has made multiple suicide attempts because of MELLOR.  MELLOR has told MV2 to kill herself.

c.    S.G. believes that MELLOR is sadistic.  If MV2 did not respond to MELLOR right away or do what he told her to do, MELLOR would send CSAM of MV2 to S.G. to embarrass her. According to S.G., MELLOR often sent voice messages to S.G. explaining why he was sending the videos or images.[4]  S.G. believed that it was MELLOR trying to punish MV2.  One time, MELLOR sent S.G. a voice message stating that he was sending these photographs to S.G. to apprise her of MV2's conduct, but S.G. believed that MELLOR was setting up a defense as to why he sent the files.

---

[4] As explained below, S.G. provided consent to search her iCloud, and I am in the process of forensically extracting her iCloud to see if I can find these messages.

16

     d.    MELLOR most recently sent CSAM to S.G. a few weeks ago.

     e.    MELLOR harassed S.G. through several accounts to include WePlay, Discord, and Twitch; however, he primarily communicated with her via text message.  S.G. confirmed that MELLOR's telephone number was 442-477-1318.

     f.    Over the past few years, MELLOR has sent S.G. numerous photos and videos of her daughter.  Some of the images depicted MV2 nude, with her genitalia exposed.  MELLOR also sent S.G. videos of MV2 masturbating.

## F.   MELLOR DISTRIBUTED CHILD PORNOGRAPHY TO MV2'S MOTHER

21.  On or about October 10, 2025, S.G. provided FBI personnel with her cellphone and consent to search her iCloud account.  On October 14, 2025, I accessed S.G.'s iCloud account and observed the following:

     a.    On or about January 11, 2025, MELLOR, utilizing telephone number 442-477-1318, sent S.G. several messages to include the following:

     i.    "Little ho3 lies a lot I love that type of bitch"

     ii.    "Can we speak like adults", "Even though I'm 17"[5]

     iii.  "she said isn't no way u Said u might let us date"

---

[5] MELLOR was 18 year old when the message was sent. His date of birth is 02/07/2006.

17

iv.    On or about January 11, 2025, MELLOR sent S.G. several other messages including stating that he wanted to adopt MV2.

22.    On or about August 17, 2025, via iMessage, MELLOR, utilizing telephone number 442-477-1318, messaged S.G. five CSAM images of MV2 (described below).  Prior to sending the CSAM images, S.G. messaged MELLOR, "So you want to play huh".  MELLOR responded, "Whos this," "Soo mom," "Your daughter is showing her Self on line," "For money," "Warning u," "Since shes still my friend."  MELLOR then sent the five images described below.  Following the images, MELLOR messaged, "Crazy right your Daughter a dirty" "Hoe."

23.    The first image depicted MV2 with her finger on top of her genitalia, displaying her vagina.

24.    The second image was a screenshot of a video call in which MV2 was displaying her vagina in a similar fashion as described above, but a male, possibly MELLOR, could be seen masturbating in the video call.  The male's penis was visible in the top right portion of the screenshot, indicating that whoever took the screenshot was the one who was masturbating.

25.    The third image appeared to be a close-up of the second image depicting MV2's vagina.

26.    The fourth image was of MV2 bent over with her vagina and anus exposed.

27.    The fifth image was of MV2 inserting her fingers into her vagina.

18

28. The entirety of the iMessage conversations would not load properly, therefore based on that context of the messages, and information provided by S.G., I believe that there are additional messages that I was unable to view.

G.   ADDITIONAL REPORTS OF INAPPROPRIATE BEHAVIOR TOWARDS MINORS

29. On or about October 6, 2025, I reviewed two additional reports generated in 2025 regarding MELLOR engaging in inappropriate conversations with minors.

30. First, on or about May 12, 2025, a concerned mother, G.G., contacted the FBI to report her that her 10-year-old son notified her that MELLOR had sent inappropriate messages and images to children on the application WePlay for approximately six months. The concerned mother provided MELLOR's full name, Department of Motor Vehicles identification number, and telephone number, 442-477-1318. The report stated that G.G. obtained MELLOR's information from a different minor who obtained a photo of MELLOR's license while speaking to MELLOR on Snapchat. The minor informed G.G. that MELLOR had been sending photographs of himself masturbating and played pornographic audio clips in voice chats with minors.

31. Second, on or about May 12, 2025, a different minor contacted the FBI to report user "AngelicDvoRaps," using telephone number 442-477-1318, later identified as MELLOR, for having inappropriate conversations with a minor, having sent

19

explicit photos of himself, and asked for explicit photos from minors on WePlay.[6]

H.   FURTHER CORROBORATING DETAILS OBTAINED THROUGH LEGAL PROCESS

32.   As explained above, MELLOR claimed that R.L. hacked his accounts and "IP"; however, MELLOR admitted to sending the CSAM of MV2 to her mother, which was done via text message from the 442-477-1318 phone number.   Moreover, the phone number that MELLOR used to send the messages and image files is the same phone number he used to contact the FBI.

33.   On or about October 7, 2025, I obtained subscriber records for telephone number 442-477-1318 from T-Mobile and observed that it was registered to MELLOR's father at MELLOR's residential address, the SUBJECT PREMISES.

34.   On or about October 10, 2025, I obtained subscriber records for three Snapchat accounts connected to MELLOR's telephone number and observed that the IP address logins were approximately 99% from a T-Mobile cellphone (MELLOR's cellphone provider), and they were from the greater Los Angeles area.   I did not see any evidence that the accounts were hacked or accessed from northern California.

I.   MELLOR LIVES AT THE SUBJECT PREMISES

35.   On or about October 6, 2025, I obtained a copy of MELLOR's California Department of Motor Vehicles Identification

---

[6] At this time of this affidavit, the minors have not been forensically interviewed.

Card and observed that his address was listed as the SUBJECT PREMISES.

36.  On or about October 6, 2025, I obtained a police report from the Los Angeles Sheriff's Department (LASD) and learned the following:

a.  On or about September 17, 2025, MELLOR was arrested by the LASD Palmdale Station for assault with a deadly weapon, sexual battery, and resisting a peace office.  MELLOR provided his address as the SUBJECT PREMISES, and his telephone number as 442-477-1318.

37.  On or about October 8, 2025, FBI personnel conducted surveillance at the SUBJECT PREMISES.  Law enforcement reviewed MELLOR's California Department of Motor Vehicles photo prior to conducting surveillance and observed a male that appeared visually consistent with MELLOR exiting the SUBJECT PREMISES, getting on a bike, possibly an e-bike, and leaving the residence.

38.  In the police report described in greater detail above, MELLOR was described as having a bike consistent with the bike observed.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital

21

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

40.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

41.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

---

cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

22

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

42.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.   For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

43.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.   Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

45.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so

23

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

46.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

48.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

49.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a

24

certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

50. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MELLOR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MELLOR's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

51. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

52. For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography) and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or possession of child pornography) (the

//

//

25

"SUBJECT OFFENSES") as described in Attachment B will be found

in a search of the SUBJECT PREMISES and on the SUBJECT PERSON.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 16th day of
October, 2025.


HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

26

# EXHIBIT 2

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | FILED |
|---|---|---|
| | | CLERK, U.S. DISTRICT COURT |

OCT 1 6 2025

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of

THE PREMISES LOCATED AT 37608 5TH STREET EAST, PALMDALE, CA 93550, AS FURTHER DESCRIBED IN ATTACHMENT A-1

)
)
)
)
)
)

Case No.  2:25-MJ-06434

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-1*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252A(a)(2) | Receipt and Distribution of Child Pornography |
| 18 U.S.C 2252A(a)(5)(B) | Access with Intent to View and/or Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Chelsea Malone*

*Applicant's signature*

Special Agent Chelsea Malone, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  10/16/2025

City and state: Los Angeles, CA

*Judge's signature*

Honorable Jacqueline Chooljian, U.S. Magistrate Judge

*Printed name and title*

AUSA: Chelsea Norell (x2624)

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

The premises to be searched (the "SUBJECT PREMISES") are the premises located at 37608 5th Street East, Palmdale, CA 93550. The SUBJECT PREMISES is a one-story with a front door that faces west. The SUBJECT PREMISES has a light brown roof, and white and light tan exterior. The attached garage is white in color. The number "37608" is labeled to the right of the front door of the SUBJECT PREMISES. The SUBJECT PREMISES includes any parking spaces, garages, storage space, and appurtenances that are assigned to the SUBJECT PREMISES.



i

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of 18 U.S.C.
§ 2252A(a)(2) (receipt and distribution of child pornography)
and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or
possession of child pornography) (the "Subject Offenses"),
namely:

a.    Child pornography, as defined in 18 U.S.C.
§ 2256(8).

b.    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that refer to child pornography, as defined in 18 U.S.C.
§ 2256(8), including but not limited to documents that refer to
the possession, receipt, distribution, transmission,
reproduction, viewing, sharing, purchase, or downloading,
production, shipment, order, requesting, trade, or transaction
of any kind, involving child pornography.

c.    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
and also including but not limited to financial records, tending
to identify persons involved in the possession, receipt,
distribution, transmission, reproduction, viewing, sharing,
purchase, or downloading, production, shipment, order,
requesting, trade, or transaction of any kind, involving child
pornography, as defined in 18 U.S.C. § 2256.

i

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.    Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of

ii

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.    Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

1.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

iii

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

iv

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

v

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable,

vi

return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

vii

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MELLOR's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MELLOR's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

viii

**AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as
follows:

## I.    PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of an application for
a warrant to search the premises located at 37608 5th Street
East, Palmdale CA 93550 (the "SUBJECT PREMISES") as further
described in Attachment A-1, and the person of KENNETH MELLOR
(the "SUBJECT PERSON" or "MELLOR"), date of birth 02/07/2006, as
further described in Attachment A-2, for violations of 18 U.S.C.
§ 2252A(a)(2) (receipt and distribution of child pornography)
and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or
possession of child pornography) (the "SUBJECT OFFENSES").

2.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II.    INTRODUCTION

3.    I am a Special Agent with the FBI and have been so
employed since April 2022.  As a Special Agent, I have conducted
and participated in many investigations into criminal activity.

1

I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of violations of federal and state law.  In my current position, I investigate the sexual exploitation of children in the Central District of California and associated violations of federal law.

4.    I have received training in the investigation and prosecution of child pornography and child exploitation offenses.  Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children.  My training and experience have given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

### III.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and

2

computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore,

3

viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.    Internet.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.    Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information,

4

account application information, and other information both in computer data and written record format.

e.    IP Addresses.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.    IP Address – IPv6.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP

5

addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.    The following definitions:

i.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

ii.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iii.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an

6

identifiable minor is engaged in sexually explicit conduct.

iv.    "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

v.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

vi.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit

7

electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

vii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

viii.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include

programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

ix. "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

x. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xi. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xii. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xiii. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xiv. A "storage medium" or "storage device" is

9

any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xv.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xvi. A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.   SUMMARY OF PROBABLE CAUSE

7.   As set forth in greater detail below, MELLOR has engaged in an online sexual relationship with a now-13-year-old girl since approximately 2022.  In 2024 and 2025, MELLOR knowingly received Child Sexual Abuse Material ("CSAM") and sent the CSAM files to the minor victim's mother.  Accordingly, there is probable cause to believe that MELLOR committed the SUBJECT OFFENSES.

## V.   STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

10

A.   MELLOR IS REPORTED TO THE FBI FOR SEXTORTION

9.   On or about October 3, 2025, R.L., a 19-year-old male, contacted the FBI to report that one of his friend's, MINOR VICTIM 1 ("MV1"), was the victim of sextortion by MELLOR.  R.L. also reported that he was aware of other victims.

10.   On or about October 6, 2025, I interviewed R.L. and learned the following:

    a.   R.L. and MELLOR met in person in 2024 and began speaking online approximately eight months ago.

    b.   R.L. is friends with MV1.  MV1 is a 15-year-old female who told R.L. that she had sent explicit photos of herself to MELLOR.  At some point MELLOR threatened to release the photos of MV1.[1]

    c.   MELLOR told R.L. that he had a 12-year-old girlfriend, Minor Victim 2 ("MV2").

11.   R.L. did not have identifying information for the minor victims outside of their Discord usernames, but was in contact with them.  R.L. stated that he would reach out to the minors and request their information to provide to the FBI.  As described in greater detail below, MV2 called me after R.L. contacted her and provided my information.

12.   On or about October 6, 2025, R.L. emailed me screenshots of Discord messages that either discussed MELLOR or

---

[1] At the time of this affidavit, MV1 has not been interviewed. A subpoena has been served for subscriber information for MV1's Discord account in order to identify her, but a response has not yet been received.

11

included messages from MELLOR.  I reviewed the messages and observed the following:

      a.   On or about August 4, 2025, MELLOR, using the Discord display name including "Lord Itachi,"[2] messaged a group chat in response to messages about 15-year-old MV1, "Idc her nudes Online I got paid for them," [MV1's first name] "is my ex," "Dumb ass," "Shes Doxxed so I paid people to go kill her."

      b.   On or about August 15, 2025, MELLOR messaged MV1 "bby" and "call can I fuck u", followed by two missed calls. MV1 informed MELLOR that she wasn't home and would be later that night.

B.    IDENTIFICATION OF MV2

13.  On or about October 6, 2026, I received a telephone call from MV2 who stated that she was notified of the investigation by R.L. I conducted a minimal facts interview of MV2, in anticipation of conducting a forensic interview of MV2 at a later time.  MV2 provided the following information:

      a.   MV2 is currently 13 years old.

      b.   MV2 sent MELLOR nude photographs, to include photographs of her vagina.

---

[2] At the time of this affidavit, a subpoena has been issued to Discord for subscriber information for this account; however, Discord has not yet responded.  Both R.L. and MV2 positively identified this display name as being used by MELLOR, which they know because they have each spoken to him on this account over an extended period, including voice and/or video calls with MELLOR.

c.    MELLOR sent the explicit photos of MV2 to one of MV2's friends.

14.    On or about October 6, 2025, I received a telephone call from MV2's mother, S.G.  S.G. provided the following information:

a.    S.G. has spoken to MELLOR on several occasions.

b.    S.G. is aware that MELLOR is an adult.

15.    MELLOR sent S.G. explicit photos of her daughter, MV2.

C.    MELLOR CALLS THE FBI

16.    On or about October 6, 2025, MELLOR, utilizing telephone number 442-477-1318, made an unsolicited telephone call to the FBI Los Angeles Field Office, Lancaster Resident Agency.  MELLOR stated that he wanted to report that he was being harassed and lied about.  MELLOR initially stated that he wanted to make the report anonymously but later provided his name and telephone number.  MELLOR provided the following information:

a.    MELLOR met R.L. at a mental health facility in Florida.  MELLOR was very aggressive in his youth.  R.L. tried to hack MELLOR's accounts.  MELLOR was previously banned from Discord for catfishing, but that was when he was much younger.

b.    MELLOR is not a "pedo," but R.L. keeps posting online that MELLOR is.

c.    MELLOR knows that people are saying he distributed photographs of his genitalia, but the photographs do not depict his genitals.

13

d.    MELLOR met MV1 in Tennessee where they lived in a home together.  MV1 lied about her age to MELLOR.  MELLOR did not save explicit photos of MV1.  MELLOR stated in the Discord group chat that he sold her nude photographs to scare her, but didn't actually do it.

e.    MELLOR was forced into a relationship with MV1 because her mother, S.G., wanted him to scare her because he was an adult.  S.G. is good friends with MELLOR's father.  Whenever MV1 sent MELLOR nude photographs, he blocked her.  MELLOR did send the nude photographs to S.G., but only to show her mom what she was doing.

f.    MELLOR discussed a third minor victim who has not been identified at this time.  MELLOR indicated that he believed his account was hacked and that R.L. or someone else was chatting with her.

g.    MELLOR believed his account was hacked because when he reviewed the recent logins to his account, some of the IP addresses showed as being located in the Van Nuys area. MELLOR claimed he didn't know where Van Nuys is.[3]

i.    I explained to MELLOR that when accessing a social media account from a cellphone, the IP address location is not exact and often shows Los Angeles or somewhere in the greater Los Angeles area.  MELLOR then stated that he does not use social media, outside of Tiktok, on his cellphone.  MELLOR only uses Discord on his computer.

---

[3] R.L. resides in Humbolt County, CA; whereas, MELLOR resides in Los Angeles County.

14

17.    On or about October 6, 2025, MELLOR called the FBI National Threat Operations Center (NTOC) on a recorded line. During the call, he provided his name and phone number, telephone number, 442-477-1318. MELLOR stated that R.L. hacked his accounts.  MELLOR admitted that he previously spoke to two minors, but claimed that he didn't talk to them anymore.  MELLOR and his father theorized that R.L. is messaging minors pretending to be MELLOR.

D.    MV2 CONTACTS THE FBI TO WARN THAT MELLOR REQUESTED SHE DELETE EVIDENCE

18.    On October 6, 2025, while speaking with MELLOR on the phone, I received a phone call from MV2.  I called her after my call my MELLOR ended, and she stated that she told MELLOR about the report to the FBI and that he had requested she delete his messages.  MELLOR had previously told MV2 to delete messages between the two.

19.    Later that night, I received an email from MV2.  The email consisted of a screenshot of a conversation between MV2 and another suspected minor victim, MINOR VICTIM 3 ("MV3").  I reviewed the screenshots and observed the following:

a.    MV3 messaged MV2 saying that MELLOR had reported MV3 and MV2 to the FBI.  MV3 theorized that MELLOR was retaliating against MV3 for calling him a "pedo."

b.    Relaying information she learned from MELLOR, MV3 told MV2 that MELLOR had a photograph of MV2's birth certificate and that MV2 had previously told MELLOR that she was 18.  MV2

15

denied ever telling MELLOR that she was 18 and explained that her mom sent him MV2's birth certificate.

E.    MV2'S MOTHER REFUTES MELLOR'S STATEMENTS

20.    On or about October 9, 2025, I conducted a follow-up interview of S.G. and learned the following:

a.    S.G. believed that MELLOR was 16 years old when he started speaking to MV2 in approximately 2022.

b.    S.G. does not know MELLOR's father and never asked MELLOR to date her daughter.  When S.G. learned that MELLOR was an adult, she was upset.  MV2 had mental health issues and S.G. didn't want to take a friend away from her, but she did not want an adult taking advantage of her.  MV2 has made multiple suicide attempts because of MELLOR.  MELLOR has told MV2 to kill herself.

c.    S.G. believes that MELLOR is sadistic.  If MV2 did not respond to MELLOR right away or do what he told her to do, MELLOR would send CSAM of MV2 to S.G. to embarrass her. According to S.G., MELLOR often sent voice messages to S.G. explaining why he was sending the videos or images.[4]  S.G. believed that it was MELLOR trying to punish MV2.  One time, MELLOR sent S.G. a voice message stating that he was sending these photographs to S.G. to apprise her of MV2's conduct, but S.G. believed that MELLOR was setting up a defense as to why he sent the files.

_____

[4] As explained below, S.G. provided consent to search her iCloud, and I am in the process of forensically extracting her iCloud to see if I can find these messages.

16

d.    MELLOR most recently sent CSAM to S.G. a few weeks ago.

e.    MELLOR harassed S.G. through several accounts to include WePlay, Discord, and Twitch; however, he primarily communicated with her via text message.  S.G. confirmed that MELLOR's telephone number was 442-477-1318.

f.    Over the past few years, MELLOR has sent S.G. numerous photos and videos of her daughter.  Some of the images depicted MV2 nude, with her genitalia exposed.  MELLOR also sent S.G. videos of MV2 masturbating.

F.    MELLOR DISTRIBUTED CHILD PORNOGRAPHY TO MV2'S MOTHER

21.  On or about October 10, 2025, S.G. provided FBI personnel with her cellphone and consent to search her iCloud account.  On October 14, 2025, I accessed S.G.'s iCloud account and observed the following:

a.    On or about January 11, 2025, MELLOR, utilizing telephone number 442-477-1318, sent S.G. several messages to include the following:

i.    "Little ho3 lies a lot I love that type of bitch"

ii.    "Can we speak like adults", "Even though I'm 17"[5]

iii.    "she said isn't no way u Said u might let us date"

---

[5] MELLOR was 18 year old when the message was sent. His date of birth is 02/07/2006.

17

iv.    On or about January 11, 2025, MELLOR sent S.G. several other messages including stating that he wanted to adopt MV2.

22.    On or about August 17, 2025, via iMessage, MELLOR, utilizing telephone number 442-477-1318, messaged S.G. five CSAM images of MV2 (described below).  Prior to sending the CSAM images, S.G. messaged MELLOR, "So you want to play huh".  MELLOR responded, "Whos this," "Soo mom," "Your daughter is showing her Self on line," "For money," "Warning u," "Since shes still my friend."  MELLOR then sent the five images described below.  Following the images, MELLOR messaged, "Crazy right your Daughter a dirty" "Hoe."

23.    The first image depicted MV2 with her finger on top of her genitalia, displaying her vagina.

24.    The second image was a screenshot of a video call in which MV2 was displaying her vagina in a similar fashion as described above, but a male, possibly MELLOR, could be seen masturbating in the video call.  The male's penis was visible in the top right portion of the screenshot, indicating that whoever took the screenshot was the one who was masturbating.

25.    The third image appeared to be a close-up of the second image depicting MV2's vagina.

26.    The fourth image was of MV2 bent over with her vagina and anus exposed.

27.    The fifth image was of MV2 inserting her fingers into her vagina.

18

28. The entirety of the iMessage conversations would not load properly, therefore based on that context of the messages, and information provided by S.G., I believe that there are additional messages that I was unable to view.

G. ADDITIONAL REPORTS OF INAPPROPRIATE BEHAVIOR TOWARDS MINORS

29. On or about October 6, 2025, I reviewed two additional reports generated in 2025 regarding MELLOR engaging in inappropriate conversations with minors.

30. First, on or about May 12, 2025, a concerned mother, G.G., contacted the FBI to report her that her 10-year-old son notified her that MELLOR had sent inappropriate messages and images to children on the application WePlay for approximately six months. The concerned mother provided MELLOR's full name, Department of Motor Vehicles identification number, and telephone number, 442-477-1318. The report stated that G.G. obtained MELLOR's information from a different minor who obtained a photo of MELLOR's license while speaking to MELLOR on Snapchat. The minor informed G.G. that MELLOR had been sending photographs of himself masturbating and played pornographic audio clips in voice chats with minors.

31. Second, on or about May 12, 2025, a different minor contacted the FBI to report user "AngelicDvoRaps," using telephone number 442-477-1318, later identified as MELLOR, for having inappropriate conversations with a minor, having sent

19

explicit photos of himself, and asked for explicit photos from minors on WePlay.[6]

H.    FURTHER CORROBORATING DETAILS OBTAINED THROUGH LEGAL PROCESS

32.    As explained above, MELLOR claimed that R.L. hacked his accounts and "IP"; however, MELLOR admitted to sending the CSAM of MV2 to her mother, which was done via text message from the 442-477-1318 phone number.  Moreover, the phone number that MELLOR used to send the messages and image files is the same phone number he used to contact the FBI.

33.    On or about October 7, 2025, I obtained subscriber records for telephone number 442-477-1318 from T-Mobile and observed that it was registered to MELLOR's father at MELLOR's residential address, the SUBJECT PREMISES.

34.    On or about October 10, 2025, I obtained subscriber records for three Snapchat accounts connected to MELLOR's telephone number and observed that the IP address logins were approximately 99% from a T-Mobile cellphone (MELLOR's cellphone provider), and they were from the greater Los Angeles area.  I did not see any evidence that the accounts were hacked or accessed from northern California.

I.    MELLOR LIVES AT THE SUBJECT PREMISES

35.    On or about October 6, 2025, I obtained a copy of MELLOR's California Department of Motor Vehicles Identification

---

[6] At this time of this affidavit, the minors have not been forensically interviewed.

20

Card and observed that his address was listed as the SUBJECT PREMISES.

36.  On or about October 6, 2025, I obtained a police report from the Los Angeles Sheriff's Department (LASD) and learned the following:

a.  On or about September 17, 2025, MELLOR was arrested by the LASD Palmdale Station for assault with a deadly weapon, sexual battery, and resisting a peace office.  MELLOR provided his address as the SUBJECT PREMISES, and his telephone number as 442-477-1318.

37.  On or about October 8, 2025, FBI personnel conducted surveillance at the SUBJECT PREMISES.  Law enforcement reviewed MELLOR's California Department of Motor Vehicles photo prior to conducting surveillance and observed a male that appeared visually consistent with MELLOR exiting the SUBJECT PREMISES, getting on a bike, possibly an e-bike, and leaving the residence.

38.  In the police report described in greater detail above, MELLOR was described as having a bike consistent with the bike observed.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

40.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

41.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

22

form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

42.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.   For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

43.    Digital device users can also attempt to conceal data
by using encryption, steganography, or by using misleading
filenames and extensions.   Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.   Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

44.    Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

45.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.   Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.   Also, there are now so

23

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

46. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

48. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

49. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a

24

certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

50.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MELLOR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MELLOR's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

51.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

52.   For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography) and 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and/or possession of child pornography) (the

//

//

25

"SUBJECT OFFENSES") as described in Attachment B will be found in a search of the SUBJECT PREMISES and on the SUBJECT PERSON.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 16th day of October, 2025.

HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

26

# EXHIBIT 3

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

<table>
<tr><td>In the Matter of the Search of<br><br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Three<br><s>Four</s> digital devices seized on October 17, 2025, currently in FBI custody in Lancaster, California</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.   2:25-MJ-07128</td></tr>
</table>

**FILED**
CLERK, U.S. DISTRICT COURT

11/14/2025

**CENTRAL DISTRICT OF CALIFORNIA**
BY: *Valerie Munoz* DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Child Exploitation |
| 18 U.S.C. § 2422(b) | Enticement |
| 18 U.S.C. § 2252A | Possession, Receipt, Distribution |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   11/14/25

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA:

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The following digital devices (the "SUBJECT DEVICES"), seized by law enforcement on October 17, 2025, and are currently in Lancaster, California, in the custody of the Federal Bureau of Investigation:

       a.   One (1) black colored tablet

       b.   One (1) black cellphone

       c.   One (1) dark colored HP computer tower

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251 (Production and/or Attempted Production of Child Pornography), 18 U.S.C. § 2252A (Possession, Access with Intent to View, Transportation, Receipt, and/or Distribution of Child Pornography), and 18 U.S.C. § 2422(b) (Enticement or Attempted Enticement of a Minor to Engage in Criminal Sexual Activity) (the "SUBJECT OFFENSES"), namely:

        a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

        a.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to, documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

        b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order,

17

requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256(8).

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)(B).

d.    Any records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

e.    Any communications with persons who appear to be minors about sexual subjects.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT DEVICES.

18

2.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFEENSES, and forensic copies thereof.

3.  With respect to any SUBJECT DEVICES containing evidence falling within the scope of the foregoing categories of items to be seized:

a.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment of other devices;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.  evidence of the times the device was used;

f.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.  records of or information about Internet Protocol addresses used by the device.

19

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**I.    SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

3.    In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICES capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this one-year period without obtaining an extension of time order from the Court.

20

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICES capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICES and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return

21

the SUBJECT DEVICES and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

22

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Chelsea Malone, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of an application for a warrant to search three digital devices (collectively the "SUBJECT DEVICES"), in the custody of the FBI in Lancaster, California, as described more fully in Attachment A:

      a.    One (1) black colored tablet

      b.    One (1) black cellphone

      c.    One (1) dark colored HP computer tower

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2251 (Production and/or Attempted Production of Child Pornography), 18 U.S.C. § 2252A (Possession, Access with Intent to View, Transportation, Receipt, and/or Distribution of Child Pornography), and 18 U.S.C. § 2422(b) (Enticement or Attempted Enticement of a Minor to Engage in Criminal Sexual Activity) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  INTRODUCTION

4.    I am a Special Agent with the FBI and have been so employed since April 2022.  As a Special Agent, I have conducted and participated in many investigations into criminal activity. I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of violations of federal and state law.  In my current position, I investigate the sexual exploitation of children in the Central District of California and associated violations of federal law.

5.    I have received training in the investigation and prosecution of child pornography and child exploitation offenses.  Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children.  My training and experience have given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

## III.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

6.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

2

7.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can

3

be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.    Internet.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.    Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on

4

their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

> e.   IP Addresses.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.  Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning

that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.    IP Address – IPv6.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.    The following definitions:

i.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

ii.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iii. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the

6

production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

iv.   "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

v.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in

7

conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

vi. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

vii. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

viii. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software,

8

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

ix.  "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

x.  "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xi.  "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xii. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xiii.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a)

9

sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xiv. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xv.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xvi. A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.  As set forth in greater detail below, search warrants were executed at KENNETH MELLOR's residence, the premises located at 37608 5th Street East, Palmdale, California 93550, and the SUBJECT DIGITAL DEVICES were seized. Based on digital evidence seized prior to the search warrant and the interview of MELLOR during the search warrant execution, there is probable

10

cause to believe that MELLOR committed the SUBJECT OFFENSES, and that evidence of the SUBJECT OFFENSES will be found on the SUBJECT DIGITAL DEVICES.

## V.   STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   FEDERAL SEARCH WARRANTS WERE EXECUTED AT KENNETH MELLOR'S RESIDENCE

10.   On October 16, 2025, federal search warrants, 2:25-MJ-6434 and 2:25-MJ-6437, were issued for MELLOR'S person and premises by the Honorable Jacqueline Chooljian, United States Magistrate Judge, for violations of 18 U.S.C. 2252A(a)(2)(receipt and distribution of child pornography) and 18 U.S.C. 2252A(a)(5)(B) (access with intent to view and/or possession of child pornography), the applications for which are attached as **Exhibit 1** and **Exhibit 2**, and are incorporated by reference.

11.   On October 17, 2025, the aforementioned search warrants were executed at MELLOR's residence, and the SUBJECT DIGITAL DEVICES were seized.

12.   Prior to the search warrant execution, I obtained and reviewed messages between MELLOR and Minor Victim 2's ("MV2") mother, S.G. During the review, I observed that MELLOR had sent several suspected CSAM images to S.G. One of the images, sent on or about August 17, 2025, depicted what appeared to be a screenshot of a video call in which MV2 was displaying her

11

vagina and in the top right of the screen, where the other user's video was visible, a penis was observed.

13.  MELLOR was interviewed during the search warrant execution and was asked about the CSAM images sent to S.G. MELLOR confirmed that he had sent CSAM images of MV2 to her mother. Moreover, MELLOR confirmed that the previously described video call screenshot was taken by MELLOR. MELLOR also confirmed that the penis was his, and that the female was MV2. MELLOR also stated that he and MV2 would get on video calls and "show" each other their genitalia. MELLOR denied taking the screenshots for sexual purposes. MELLOR indicated that he deleted the images on his phone but may have still been on his phone in the deleted folder.

14.  At this time of this affidavit, I have begun a review of the SUBJECT DIGITAL DEVICES and observed items related to MV2. At this time, I am pausing my review to seek out an additional warrant for the new SUBJECT OFFENSES. Based on the facts detailed above, I believe there is probable cause to search the SUBJECT DIGITAL DEVICES for the SUBJECT OFFENSES.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

15.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

16. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

17. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

13

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

18.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

19.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

21.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

14

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

22. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

24. For all the reasons described above, there is probable cause to that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 14th day of
November, 2025.

_____
UNITED STATES MAGISTRATE JUDGE

15

# EXHIBIT 4

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>"dvoraps69," unique ID: 1369028094484025424 that<br>is within the possession, custody, or control of<br>Discord Inc. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:25-MJ-07413 |

### APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of: 18 U.S.C. § 2251(a)(e)(production or attempted production of child pornography), 18 U.S.C. § 2422(b) (coercion and enticement), 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography), and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or possession of child pornography)

The application is based on these facts:

*See attached Affidavit and Exhibits 1-3, which are incorporated herein by reference.*

*/s/ Chelsea Malone*
*Applicant's signature*

Chelsea Malone, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date and time:  November 26, 2025

*Judge's signature*

City and State:  Los Angeles, CA

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Sara Vargas (x8611)

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNT identified as "dvoraps69," unique ID: 1369028094484025424 (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of Discord Inc., a company headquartered at 444 De Haro St. Suite 200, San Francisco, California 94107, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**I.   SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Discord Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images

i

of child pornography.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed one year from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this one-year period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

ii

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II. <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, including:

i.    All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

iii

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

iv.   All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

v.    All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, the PROVIDER shall provide the salt value used to compute the stored password hash value, and any security questions and answers.

b.    All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account

iv

status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)  the SUBJECT ACCOUNT.

(II) any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate **email address listed in subscriber records** for the SUBJECT ACCOUNT or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate email address.

(III)     any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT.

ii.  Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates, and times associated with the recognition of any such cookies;

iii. Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier,

v

Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed;

(I)  any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.iii.

iv.  Any information showing the location of the user of the SUBJECT ACCOUNT, including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

v.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups,

vi

and locations, and including specifically the specific product name or service to which the connection was made.

III.  **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

41.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251(a)(e)(production or attempted production of child pornography), 18 U.S.C. § 2422(b) (coercion and enticement), 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography), and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or possession of child pornography) (the "Subject Offenses"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts;

ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Records, documents, programs, photographs, applications, or materials related to identifying, selecting, and/or grooming of victims for the purposes of committing the SUBJECT OFFENSES;

iv.  Records, documents, programs, applications, materials, or information relating to the distribution of child sex abuse material;

vii

v.   Records of any payments offered or made in exchange for child sex abuse material, including payment methods; and

b.   All records and information described above in Section II.10.b.

## IV. __PROVIDER PROCEDURES__

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

> Special Agent Chelsea Malone
> 610 W Ave L Lancaster CA 93534
> 661-729-7012
> cmalone2@fbi.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.

viii

Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April 2022.  One of my responsibilities with the FBI includes investigations into the sexual exploitation of children and child pornography in the Central District of California.  I have received training in the investigation and prosecution of child pornography and child exploitation offenses.

3.    Through my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children.  I have attended training classes concerning computer crimes and the sexual exploitation of children on the Internet.  This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses.  My experience in investigations in this regard has supplemented my understanding of how people involved in offenses related to the sexual exploitation of children use the Internet to further those offenses.

4.    I make this affidavit in support of an application for information associated with the account identified as Discord username "dvoraps69," unique ID: 1369028094484025424 (the "SUBJECT ACCOUNT") that is stored at premises controlled by

Discord Inc. (the "PROVIDER"), a provider of electronic

communication and remote computing services, headquartered at

444 De Haro St. Suite 200, San Francisco, California 94107.[1]  The

information to be searched is described in Attachment A.  This

affidavit is made in support of an application for a warrant

under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and

2703(d)[2] to require the PROVIDER to disclose to the government

copies of the information (including the content of

communications) described in Section II of Attachment B.  Upon

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

5.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 2251(a)(e)(production or attempted production of child pornography), 18 U.S.C. § 2422(b) (coercion and enticement), 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography), and 18 U.S.C. § 2252A(a)(5)(B)(access with intent to view and/or possession of child pornography).

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    As set forth in greater detail below, in October 2025, search warrants were executed at the residence of KENNETH MELLOR

3

("MELLOR"), the premises located at 37608 5th Street East, Palmdale, California 93550, and digital devices were seized. During a review of MELLOR's cellphone, I observed email address killerkenny987@gmail.com and Discord username "dvoraps69." I conducted database checks for email address killerkenny987@gmail.com and observed a National Center for Missing and Exploited Children ("NCMEC") CyberTipline Report generated based on the SUBJECT ACCOUNT, linked to the killerkenny987@gmail.com email address, based on the online enticement of children for sexual acts. More specifically, in the messages provided by the CyberTipline Report, MELLOR referenced having nude photographs of MINOR VICTIM 2 ("MV2"), a previously identified minor girl, whom MELLOR produced CSAM of and then distributed the CSAM to MV2's mother. Based on a review of the messages provided within the CyberTipline Report and previously gathered information about the minor victims in the investigation, there is probable cause to believe that MELLOR committed the SUBJECT OFFENSES, and that evidence of the SUBJECT OFFENSES will be found in the SUBJECT ACCOUNT.

## III. DEFINITION OF TERMS

8.    The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.

b.    The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP

4

allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

c.    An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most Internet Service Providers (defined below) maintain records of which subscriber was assigned which IP Address during an online session.

5

d.    The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.    A "chat" refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

f.    "Chat room" refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals

6

may also have the ability to transmit links to electronic files to other individuals within the chat room.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Federal Search Warrants Executed at Mellor's Residence**

9.   On October 16, 2025, the Honorable Jacqueline Chooljian, United States Magistrate Judge, issued warrants to search MELLOR'S person and premises for violations of 18 § U.S.C. 2252A(a)(2) (receipt and distribution of child pornography) and 18 § U.S.C. 2252A(a)(5)(B) (access with intent to view and/or possession of child pornography). Those warrants are attached as **Exhibit 1** and **Exhibit 2**.

10.   On November 14, 2025, the Honorable Charles Eick, United States Magistrate Judge, issued a warrant to search digital devices seized pursuant to the search warrants in **Exhibits 1** and **2**.  This third warrant, which is attached as **Exhibit 3**, contained additional subject offenses: 18 U.S.C. § 2251 (Production and/or Attempted Production of Child Pornography), and 18 U.S.C. § 2422(b) (Enticement or Attempted Enticement of a Minor to Engage in Criminal Sexual Activity). **Exhibits 1**, **2** and **3** are incorporated herein by reference.

**B.   Identification of CyberTipline Reports 218257457 and 218263465**

11.   On November 21, 2025, while reviewing MELLOR's cellphone pursuant to the search warrant, I saw evidence that MELLOR used email address killerkenny987@gmail.com and Discord username "dvoraps69" on the device.  I conducted law enforcement database checks for email address killerkenny987@gmail.com and

7

observed CyberTipline submissions 218257457 and 218263465 were submitted to NCMEC by Discord based on messages from the SUBJECT ACCOUNT that occurred on or about August 18, 2025.  More specifically, Discord indicated that the messages included "online enticement of children for sexual acts."  Discord provided a portion of those messages, which I reviewed and confirmed that the messages were not on MELLOR's cellphone.[3] While reviewing the messages within the CyberTipline submissions, I observed that MELLOR was engaged in a conversation with the MINOR VICTIM 2 ("MV2"), a 13-year-old girl residing in Tennessee.  MV2 was previously identified in the warrant application in **Exhibit 1** and **Exhibit 2**.

12.  The CyberTipline submissions showed that MELLOR, using the SUBJECT ACCOUNT, had the following conversation with MV2, utilizing Discord unique ID 1118346250903879800:

MELLOR:   ill show her all the picks i have of u ect

MELLOR:   should have fucken listened

MV2:      Bro what

MV2:      I did listen

MELLOR:   nope

MELLOR:   join on ur alt

MELLOR:   also ur mom is in Tennessee right now right

MELLOR:   the number says Tennessee

---

[3] I have separately and independently reviewed these reports without a warrant.  This is because the private search exception to the warrant requirement applies here where representatives from Discord reviewed the files of their own volition.  See United States v. Rosenow, 50 F.4th 715, 730 (9th Cir. 2022).

| | |
|---|---|
| MV2: | Mhm |
| MV2: | Yup |
| MELLOR: | kk |
| MELLOR: | bye thief |
| MV2: | what r u gonna do, go to Tennessee? |
| MELLOR: | no |
| MELLOR: | im calling her |
| MV2: | Exactly |
| MV2: | Bruh |
| MELLOR: | and texting her all the photos |
| MV2: | Of what? |
| MELLOR: | im making sure right numb |
| MELLOR: | ur nudes |
| MELLOR: | I screen shotted u |
| MV2: | Why do you even have those saved? |
| MV2: | Those are old |
| MELLOR: | huh old |
| MELLOR: | funny I think they from to nights ago |
| MV2: | Wdym? |
| MV2: | I never sent you any nudes? |
| MELLOR: | Ur right |
| MELLOR: | I just have this |
| MELLOR: | Ur choice |
| MV2: | I HAVENT DONE ANYTHING TO YOU |
| MELLOR: | yeah u have |
| MV2: | WHY ARE YOU EVEN STILL TALKING TO ME |
| MELLOR: | im asking nicely and u think im joking |

9

```
MELLOR:   cause u have my shit

MV2:      LIE AGAIN YOU CALLED ME FUSSING AT ME

MELLOR:   all good ask me a dumb question u mom will see

MELLOR:   no I wouldn't have if u leave me alone

MV2:      Hey guess what your 19 turning 20 and I'm 13

MELLOR:   give me all my shit on ur alt

MELLOR:   u think u funny

MELLOR:   and ill call mom and tell her u do this too a lot
          of men

MV2:      no I don't

MV2:      You force me to

MELLOR:   u got 30 seconds call me or ill actually call
          real real

MV2:      Bro I don't have anything else of yours

MELLOR:   ur choice
```

13.  The messages were consistent with the information previously provided by MV2 and her mother.  More specifically, MV2's mother, S.G., had previously reported that MELLOR extorted her daughter and sent CSAM of MV2 to S.G. when MV2 did not do what MELLOR told her to do.

14.  Prior to executing the search warrant at MELLOR's residence, S.G. provided me with various messages that MELLOR had previously sent to S.G.  During the review, I observed that MELLOR had sent several CSAM images to S.G.  One of the images, sent on or about August 17, 2025, depicted what appeared to be a screenshot of a video call in which MV2 was displaying her

10

vagina and in the top right of the screen, where the other user's video was visible, a penis was observed.

**C.    Mellor's Post-<u>Miranda</u> Interview on October 17, 2025**

15.    MELLOR was issued <u>Miranda</u> warnings, waived them, and agreed to be interviewed during the search warrant execution at his residence on October 17, 2025.  MELLOR stated the following:

a.    MELLOR sent CSAM images of MV2 to MV2's mother, S.G.

b.    MELLOR took the previously described video call screenshot and confirmed that the penis was his and that the female was MV2.

c.    MELLOR and MV2 would get on video calls and "show" each other their genitalia but denied taking the screenshots for sexual purposes.  I believe that the "nudes" that MELLOR referred to in the Discord messages detailed in the CyberTipline report are the images he sent S.G., as detailed above.

d.    MELLOR engaged in sexual video calls with MINOR VICTIM 1 ("MV1"), a 15-year-old girl, via Discord.

e.    MELLOR and MV1 would show each other their bodies while on Discord video calls.  MV1 would show her entire body, while MELLOR showed his penis.

f.    MELLOR's Discord username was "dantekingofall."

g.    MELLOR did not recall any of his other Discord accounts because they were old and had been banned.

h.    MELLOR did not recognize the username "Dvoraps," but that Dvo Raps was a famous rapper on Discord and Youtube.

11

16.   At the time of the interview, the name "Dvoraps" had not been identified as associated with a Discord account. However, based on my review of FBI databases, I know that "AngelicDvoRaps" had been previously reported to the FBI for the online enticement of minors.  More specifically, according to FBI databases, on or about May 12, 2025, a minor contacted the FBI to report that WePlay user "AngelicDvoRaps", telephone number 442-477-1318, later identified as MELLOR's cell phone number[4], had sent explicit photos to minors and requested pictures in return.

17.   Based on my training and experience, I believe MELLOR was not honest about the "Dvoraps" username and may have denied knowledge of the account due to its use in furtherance of the SUBJECT OFFENSES.

18.   Based on all of the information detailed above, there is probable cause to believe that MELLOR is subscribed to the SUBJECT ACCOUNT and used the SUBJECT ACCOUNT in furtherance of the SUBJECT OFFENSES.  Moreover, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found in the SUBJECT ACCOUNT.

## V.   BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND DISCORD

### A.   Background on Use of Computers and Child Pornography

19.   Based upon my training and experience in the investigation of child pornography and with social media

---

[4] On October 6, 2025, MELLOR contacted the FBI and provided 442-477-1318 as his telephone number.  The billing party for the cell phone was later verified to be MELLOR's father via subpoena response from T-Mobile.

12

platforms, and information related to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography:

20. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer and digital device users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced, transported, and stored.

B. **Background on Discord**

21. Discord Inc. owns and operates a free-access all-in-one voice and text chat application and website of the same name that can be accessed at http://www.discordapp.com (hereinafter,

13

"Discord").  Discord's application (and website) is an online
communication platform that allows users to create private
virtual communication servers that can be shared with others.
On those servers, users can create dedicated audio, video, and
text communication channels, and users are able to join or
connect to those channels to communicate.  Discord channels are
similar to a chat room, in that users are able to share real-
time audio, video, and text messages with other participants in
the channel.  Discord users are also able to live stream and to
send one-to-one direct messages with other users.

22.  To use Discord, a user creates an account and uses the
account to communicate with other Discord users.  Each Discord
user account has numerous identifiers:

a.  First, when user first registers an account,
Discord asks users to enter an email address, to create a
username and password, and enter a date of birth.  The
information entered during the registration process is not
verified by Discord.  Additional information such as full name,
telephone numbers, screen names, credit card and billing
address, and other personal identifiers may be added.  Users can
also link their social media accounts to their Discord accounts.
A user must verify their email in order to be able to use some
of the features of Discord such as sending messages in servers
and channels.

b.  Next, Discord assigns each account a permanent
identification number, referred to as a "user ID number," which
Discord uses to internally identify and track an account,

14

including in its audit logs.  The user ID number is visible to a user when the user is viewing the user's account in "Developer Mode" on a computer, but is mostly relevant only to Discord's internal recordkeeping.  The user ID number does not change when the user changes the username.

     c.   Then, a Discord user creates a unique username of its choosing for the account.

     d.   Finally, Discord then creates a "tagID," which is the user's unique username followed by a hash and an auto-generated 4-digit code, in the format of characters#numbers (for example, "kingofdarkness#5547").  When using Discord on a computer, the user's Discord tagID is visible in the bottom left corner of the Discord screen.  A user can change its username at any time.  A change in username does not affect the tagID.

     e.   Additional information is required when purchasing an in-app service called "Discord Nitro."  Discord Nitro is a premium service within Discord that allows upgraded services including changing tagIDs, customizable avatars, and larger uploads of content.

23.  Once registered, a user can access different features on Discord.  Some, but not all, of those features follow:

     a.   Discord users can exchange private messages between users (i.e., messages that do not appear in a public text channel, but which are revealed only to the users participating in the private communication), participate in public text chatroom discussions, and voice chat.

15

b.   Discord also supports live streaming of video from a user's device.

24.   Discord retains IP logs for a given user ID or IP address.  These logs can contain information about the actions taken by the user ID or IP address on Discord, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Discord profile, that user's IP log would reflect the fact the user viewed the profile, and would show when and from what IP address the user did so.

25.   From my training, experience, and knowledge of this and similar cases, I know that users of Discord and similar applications access Discord using their mobile devices, as well as with computers.  Accordingly, I know that a user can access the user's Discord account by connecting to the Internet using IP addresses outside of their residence, such as if the user accesses Discord on a smartphone while connected to a fWiFi network at work or school.  For that session, the records would list the IP address of that WiFi network used by the user to connect to the Internet to access Discord.

26.   In my training and experience, I know that social network providers like Discord also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches.  In some instances,

16

providers may also keep records of which websites or contents were "clicked on" as a result of these searches.  This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

27.  Social network providers like Discord typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Discord users might communicate directly with Discord about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Discord typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In addition to Discord's computers or servers, the Discord application loads this information onto its users' digital devices and a digital device with Discord on it is likely to retain some of the above-described information.

28.  The subscriber will also generally need to use a password that will allow the user to gain access to the account. Many providers do not store the password directly, rather they

use an algorithm (often referred to as a "hashing" algorithm)
that is performed on the password and generates a new random of
string of numbers and characters, which is what the provider may
store.  When a user enters his or her password, the hashing
algorithm is performed on the password before it is presented to
the provider, and the provider will verify the hash value for
the password (rather than the password itself) to authorize
access to the account.  As an added security feature, some
providers insert additional text before or after the password,
which additional text is referred to as "salting" the password.
The hashing algorithm is then performed on the combined password
and salt, which is the hash value that will be recognized by the
provider.  Alternatively, or in addition to passwords, users may
be required to select or propose a security question, and then
provide an answer, which can be used to substitute for a
password or to retrieve or reset a user's password.

29.  I have also learned that providers of email and social
media services like Discord often track the behavior and
activities of persons using accounts by using cookies, which are
strings of characters and numbers stored on a person's computer
on their web browser.  These cookies can often show whether more
than one account was accessed by the same computer (and
specifically the same web browser), as the provider can
recognize that cookie when the same device returns to the
service to access an account.

30.  In order to identify other accounts used or maintained
by the user of a SUBJECT ACCOUNT, the warrant also calls for the

18

PROVIDER to disclose both (1) any cookies associated with the SUBJECT ACCOUNT, i.e., those cookies that were placed on any computers or web browsers (for example, Internet Explorer or Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the identity of any other account in which the same cookie or cookies used to access the SUBJECT ACCOUNT was/were recognized. If in the course of the investigation the digital devices used by the subject(s) of the investigation are found, they can be searched to determine if the cookies recognized by the provider are stored on those devices.  The warrant also calls for the PROVIDER to identify any other accounts accessed by any computer or web browser using the same cookies as the SUBJECT ACCOUNT by providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

31.  Providers of email and social media like Discord often maintain, have access to, and store information related to the location of the users of accounts they service.  That information may be obtained by the provider in a number of ways. For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.  It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

19

32.  Providers like Discord also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNT.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices.  Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the devices using its services. Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions, unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").  Apple, one of the primary suppliers of mobile devices used to access accounts like the SUBJECT ACCOUNT, had previously used an identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or

20

"app" could be used to target advertisements for the user of that device.  Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still unique to a particular device, but which can be wiped and re-generated anew by a user if a user chooses to do so.  Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services.  Google uses a similar advertiser ID referred to as an AAID.

33.  These device identifiers can then be used (a) to identify accounts accessed at other providers by that same device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access a SUBJECT ACCOUNT.  The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

## VI. <u>BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER</u>

34.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account,

21

investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

35.  Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

36.  I also know based on my training and experience that criminals discussing their criminal activity may use slang,

22

short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

37. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

38. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case

23

is completed through disposition, trial, appeal, or collateral proceeding.

a.    I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.    I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

24

## VII. <u>REQUEST FOR NON-DISCLOSURE</u>

39. Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States. There is reason to believe that such notification will result in (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; (5) otherwise seriously jeopardizing the investigation; or (6) unduly delaying trial. While the user of the SUBJECT ACCOUNT is aware of the investigation, he is not aware of the specific investigative methods being utilized in the investigation. Since the messages described within the CyberTipline report appeared to have been deleted from his digital devices, he is likely unaware of the FBI's knowledge of the messages. Moreover, since the user of the SUBJECT ACCOUNT has previously contacted minor victims and requested that they delete evidence, there is a reasonable belief that notification of this warrant to the target may result in the intimidation of minor victims and destruction of evidence.

25

## VIII.    CONCLUSION

40.   Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of
November , 2025.

_Alicia G. Rosenberg_
_____
UNITED STATES MAGISTRATE JUDGE